# Supreme Court of Florida

_____

No. SC10-2170
_____

**TAVARES DAVID CALLOWAY,**

Appellant/Cross-Appellee,

vs.

**STATE OF FLORIDA,**

Appellee/Cross-Appellant.

[January 26, 2017]

PER CURIAM.

Tavares David Calloway was convicted of five counts of first-degree murder for the deaths of Derwin Copeland, Frederick McGuire, Adolphus Melvin, Gary St. Charles, and Trenton Thomas, along with armed robbery, armed kidnapping, and armed burglary with an assault or battery. A jury recommended a sentence of death for each count of first-degree murder by a vote of seven to five. We have jurisdiction. See art. V, § 3(b)(1), Fla. Const.

## FACTS AND PROCEDURAL HISTORY

### 1997

On January 21, 1997, eighteen-year-old Anthony Strachan was at home in his family's apartment on 580 Northwest 64th Street in Miami, cutting a friend's hair. Strachan went into the kitchen and, through the kitchen window, saw one of his neighbors, "Shorty," standing outside on 64th Street with two unknown men. One man, who wore a skull cap and a heavy brown coat that resembled a field or military jacket, was taller than Shorty. Strachan saw Shorty walk up the apartment stairs and past the jalousie kitchen door of his family's apartment with one of the unfamiliar men. At some point later in the day, Strachan heard loud booming noises that he assumed were from a neighbor's stereo. He opened the front door to see if anything outside might explain the noise, but saw nothing and closed the door.

Strachan later walked downstairs to retrieve something from his mother's car. On his way back to the apartment, he heard the door of Apartment 8 open and saw the unfamiliar man exiting the apartment complex. He and Strachan nodded at each other as they passed. The unidentified man appeared to be older than Strachan and held a small box the size of a shoe or cigar box that Strachan recognized as one often carried by Shorty. The brown coat he wore struck Strachan as unusually heavy for the weather in Miami.

Elsewhere that day, Latonya Taylor was concerned about her fiancé, Adolphus "Tank" Melvin. He was supposed to pick up their two-year-old son

from day care, but the day care center called her and informed her that Melvin never arrived. She attempted to contact him via his beeper and cell phone, but he did not respond. She called her friend, Gwendolyn James, to ask if she had been in contact with Melvin or his friend Trenton Thomas, James's fiancé. James paged Thomas, who also did not respond.

Taylor drove to an apartment in Liberty City that was the residence of Gary "Shorty" St. Charles, where she had previously dropped Melvin off. She saw Melvin's car in the parking lot, heard loud music playing from one of the upstairs apartments, and assumed that it emanated from St. Charles's apartment. When she opened the door to Apartment 8, she found a grisly scene, ran with her son to the nearby home of Melvin's sister, and called the police.

When the police arrived, they found the bodies of Melvin, Thomas, St. Charles, and Derwin Copeland. Frederick McGuire was still alive, and paramedics transported him to the hospital for treatment, where he died the next day. All five men had been shot once in the head, execution style. Their ankles had been bound with duct tape, and their hands and wrists were bound behind their backs with duct tape. Duct tape also covered their eyes and mouths. The men were clad only in underwear and undershirts; their clothing and shoes were piled in a corner of the living room. Styrofoam containers filled with half-eaten food were found on the

dining room table. Officers noticed that the music on the stereo was very loud, even over the noise of nearby I-95.

The initial investigation of the apartment and surrounding areas lasted for nearly twenty hours. The apartment appeared to have been ransacked before the officers arrived. Although crime scene investigators collected blood samples, they did not specifically search for DNA because DNA collection was not the standard practice of the City of Miami Police Department in 1997. Eighty-nine latent fingerprint cards were lifted from around the apartment, although most of the prints were later found to have matched the victims. All of the pieces of duct tape that were recovered from the apartment were commingled in one plastic bag, but the pieces were later separated. One empty roll of duct tape was found on the floor near the piles of clothing. Investigators also recovered five spent .45 caliber shell casings.

The medical examiner estimated that the time of death for Melvin, Thomas, Copeland, and St. Charles was between 3:00 p.m. and 7:00 p.m. Their wounds were consistent with a .45 caliber firearm, which resulted in an immediate loss of consciousness and death. McGuire was similarly instantly incapacitated, although he did not die until the following day. Additionally, Thomas's head wound featured stippling, which indicated that he was shot at close range. None of the men exhibited defensive wounds.

Although investigators found no significant quantity of drugs in the apartment, they did find marijuana residue and drug paraphernalia. Additionally, a small bag of marijuana was found in the clothing of Melvin. Investigators also recovered cash from under a waterbed mattress and a gold medallion under the body of Melvin, but there was no jewelry or marijuana found on any of the other victims. They concluded that Melvin was the leader of a small group involved in marijuana packaging and distribution. St. Charles, who resided in the apartment, served as his "second-in-command," and Thomas and McGuire oversaw the packaging of the marijuana. Copeland was not believed to have been formally involved in the group's activities, but he had recently been in a car accident and was dependent on Melvin, his uncle, for transportation. Despite several months of investigation by the City of Miami Police Department, the case went cold.

<u>1998</u>

On May 11, 1998, Detective George Law received a phone call from a woman who did not identify herself. Law had investigated the murder of Michael Gosha, whose family and friends had informed Law that Gosha was last seen alive with a man identified as "Black." The woman advised Law that "Black" was Tavares Calloway, who knew Gosha and was involved in the quintuple murders from 1997, along with "Tote."

On May 12, 1998, Detective Kelvin Knowles brought Antonio "Tote" Clark to the police station. Clark signed a <u>Miranda</u>[1] waiver, and eventually told the police that he and Calloway had gone to St. Charles's apartment to commit a robbery at the direction of Dwight Campbell, who was also known as Frank. Clark said he was unarmed and did not expect anyone to die. Calloway had instructed the victims to remove their clothing to be sure they were not armed and told Clark to bind them with duct tape. Calloway shot the men, and he and Clark left the scene.

Based on Clark's statement, Detective Knowles was dispatched to pick up Calloway, who had a bench warrant for driving with a suspended license. Knowles was unable to make contact with Calloway initially, but he left a card indicating that Calloway should call him. When Calloway called, Knowles informed him of the bench warrant and indicated that detectives needed to speak with him about other matters. Calloway agreed to come to the station and asked Knowles for transportation. He was nineteen years old.

Calloway arrived at the station around 3:00 p.m. on May 13 and was directed to an interview room with a two-way mirror. He was not handcuffed, and officers elected not to record the interview. Detectives Law and Alberto Borges

---

1. <u>Miranda v. Arizona</u>, 384 U.S. 436 (1966).

began to question him, and Calloway signed a <u>Miranda</u> waiver at 3:31 p.m. Law

asked Calloway if he wanted water, which Calloway declined, explaining that he

was fasting that day because he was a born-again Christian. Calloway appeared

relaxed and calm. Although Calloway was nineteen years old, Law thought he

looked older and seemed mature for his age.

Law initially questioned him about the Gosha homicide, and Calloway

admitted that he and Gosha planned and participated in the home invasion robbery

of Shellie Wilson ("Twin"), and that Calloway suspected Gosha was murdered in

retaliation for that robbery. Borges then asked him about the quintuple homicides,

but Calloway denied involvement and repeatedly told them to "find the facts."

When Borges showed Calloway photographs of the victims taken from the

apartment, Calloway did not respond, other than to repeat, "find the facts."

Around 5:00 p.m., Law and Borges left Calloway alone in the interview room.

Detective Ervins Ford, who had viewed the questioning from the attached

observation room, entered the interview room after 7:00 p.m. In an effort to build

rapport, Ford asked Calloway about his background and upbringing. Calloway

explained that his grandmother had raised him and imposed regular church

attendance and nightly Bible study in the household. Ford retrieved a Bible from

one of the desks in the homicide office and returned to the interview room.

Calloway became noticeably more comfortable and confident with Ford as

Calloway began to recite passages from the Bible. Calloway referenced many passages that concerned God's vengeance and seemed to identify with the Archangel Gabriel, whom Calloway described as God's punisher. When Ford asked him whether the victims had been punished by their deaths, Calloway replied that they should have seen it coming because they had been selling drugs for a long time and "were doing a lot of dirt." After watching Calloway from the observation room, Detective Tony Davis entered, told Calloway that the Bible states "thou shall not kill," and walked out of the room with the Bible. Ford exited the room as well.

Over the course of the evening, several officers asked Calloway if he needed anything, offers which he declined. At approximately 8:00 p.m., Detective Knowles returned to the interview room and listened as Calloway told him that the victims were bad people, drug dealers, and they worked for the devil. Around 11:00 p.m., Detective Juan Gonzalez entered and falsely informed Calloway that his fingerprints were found in Apartment 8 in 1997. Calloway responded that perhaps he had been to a hardware store and touched a door. When Gonzalez pressed him as to how a door with his fingerprints on it ended up in Apartment 8, Calloway became defensive and told Gonzalez to do his job and leave the room, which he did.

Law returned to the interview room at approximately 1:00 a.m. on March 14, along with Detective George Pereira from the Miami-Dade County Police Department to discuss the Twin home invasion robbery, which Pereira had investigated. They did not discuss the quintuple homicides with Calloway at that time. Calloway denied Pereira's request to record the interview. Pereira reminded Calloway of his Miranda rights, and Calloway repeated that he did not want a lawyer and did not indicate that he wished to end the questioning.

Gonzalez returned between 2:30 a.m. and 3:00 a.m., and Calloway provided some biographical information, including that three months before the murders, he had lived next door to Campbell, whom Calloway did not know well. Gonzalez told Calloway that his fingerprints were found on duct tape that was used to restrain the victims, which Gonzalez knew to be false. Calloway responded evasively that he used duct tape for many reasons, but did not know how duct tape with his fingerprints came to be in Apartment 8. When asked if he knew any of the victims, Calloway said that he knew Melvin as an unpopular snitch. Although Borges noticed a shift in Calloway's demeanor at this point, he directed the interview to stop, given the late hour. Several officers slept at their desks, and Calloway was left alone in the interview room to sleep.

Around 8:00 a.m. on May 14, Law checked on Calloway and found him asleep in the interview room. After Calloway was awakened by Law, Calloway

asked to call his girlfriend, Diane Odom. Law directed him to a telephone and observed the phone call, but did not listen to the conversation. He saw Calloway's demeanor change and decided to resume questioning when they returned to the interview room. At some point that morning, one of the officers brought Calloway breakfast, which he eventually ate.

Law began by telling Calloway that he could tell Calloway loved his girlfriend. Law and Detective Willie Everett then began to confront Calloway with inculpatory evidence. Law told Calloway that they knew he was at the crime scene because his fingerprints were found on the door and on duct tape recovered from the scene.[2] Everett also told Calloway that they had information that he wore camouflage clothing and sunglasses that day.[3] Everett also told Calloway that if he was a good Christian, God would want him to confess. The detectives saw him

---

2. During trial, Law admitted this was a ruse to pressure Calloway to confess. Neither Calloway's fingerprints nor his DNA were ever recovered from the apartment.

3. During their questioning, Sergeant Eunice Cooper slipped a note under the door of the interrogation room. The note contained a list of questions that the detectives should ask, including whether "Black" wore army fatigues, a hat, or sunglasses on the day of the murders; whether he had come from the catwalk adjacent to I-95; if he carried anything, specifically a new jacket, shoe box, or cigar box; and if the "Haitian boy downstairs" was approached near the car. When Everett later asked Cooper where she had obtained the information, she replied that she was not at liberty to disclose her source. He did not question her response.

tear up, put a hand on his shoulder, and told him it would be ok. Calloway said that if they would give him a minute, he would tell them everything.

Around 9:00 a.m. on May 14, Calloway told them that three days before the murders in January 1997, he had gone to Liberty Market to purchase camouflage clothing and sunglasses in preparation for a "lick," meaning a robbery.[4] On January 21, 1997, Michael Gosha came to him and said it was time to do the lick. They went to Campbell's home first, and then Calloway and Clark went to St. Charles's residence on 580 Northwest 64th Street. Calloway wore an Army hat and camouflage clothing.

When they arrived, they saw St. Charles exit a car. Calloway used a .45 caliber gun to place St. Charles in a chokehold and force their way into Apartment 8, where they found Melvin and three other men eating from Styrofoam containers. Calloway demanded to know where the drugs were and ordered everyone to get on the floor and remove their clothing and jewelry. Calloway told Clark to find something to restrain the men, and when Clark turned up empty-handed, he sent Clark to purchase tape. Clark returned with duct tape, and they began to tape everyone. When they ran out of duct tape, Calloway directed Clark to purchase

_____

4. Calloway was eighteen years old in January 1997.

more.  Calloway placed tape across the eyes of the victims, "because they were looking" at him.

At a loss for what to do next, Calloway sent Clark to Campbell for further instructions.  Clark returned and told him that Campbell said to kill two of the men.  Calloway responded that killing only two of them would create problems because they could identify Calloway and would retaliate.  Clark returned to Campbell's apartment and reported to Calloway that Campbell said to kill everyone.  Calloway increased the volume of the stereo to muffle the sounds of gunshots.  He shot each of the victims in the head once.  Calloway and Clark took two pounds of marijuana, jewelry, cell phones, beepers, and cash; wiped down any fingerprints they might have left; and fled to Campbell's house.  They informed him they had completed the lick and went to the home of another friend.  A short time later, Calloway disposed of the gun and provided the stolen jewelry to a relative of Gosha's to pawn.

Law asked Calloway if they could have a stenographer record a formal, sworn statement, and Calloway agreed.  Additional details were included in the statement, including that before they settled on Melvin as the target of the lick, Calloway and Campbell discussed other potential targets.  Calloway also indicated that Atwon "Twon" Davis waited for Clark and him in the parking lot while they

were in the apartment before driving them to a friend's house.[5]  Gosha, Clark, and Calloway distributed the items taken from the apartment among themselves before they parted ways.  Calloway later burned his clothing.

Law arranged for Diane Odom to come to the police station.  When she arrived, Law and Everett left Odom and Calloway alone and unmonitored in the interrogation room.  He was crying and told her he had to come clean and get right with God.  Sergeant Cooper later saw Calloway in the homicide office, and he told her that if he had not confessed, they would never have been able to prove his involvement.

Around 1:00 p.m., Calloway agreed to show Law and Everett the area where he disposed of the gun.  Calloway, who was not handcuffed because the officers thought he was cooperative, Odom, Everett, and Law drove in a van first to Liberty Market, where Calloway told the detectives he had purchased clothing for the lick.  They then drove to the area where Calloway claimed to have disposed of the gun, which was a litter-strewn field.  Despite a brief search, the gun was not found.

The officers then proceeded to the home of one of Calloway's relatives, where he spoke to and hugged his family members.  The officers left Odom with

---

5. Officers later learned that Davis was incarcerated at the time of the homicides and therefore could not have driven Calloway and Clark from the crime scene.

Calloway's relatives and eventually returned with Calloway to the police station. Upon their return, Calloway reviewed and signed his transcribed statement, twenty-six hours after he first entered the police station. Ultimately, eleven police officers questioned Calloway over the course of approximately eighteen hours, during which time he was not handcuffed.

On May 26, 1998, a grand jury indicted Calloway and Clark on eight counts: five counts of first-degree murder, one count of armed robbery, one count of armed kidnapping, and one count of armed burglary with an assault or battery. The joint indictment was eventually severed.

<u>Discovery</u>

In 2008, Detective Borges first learned that Strachan may have witnessed some of the events that day. At that point, it was revealed that Sergeant Cooper, the author of the note that was slipped under the door during Calloway's confession, had received information from one of her friends, Val Williams. Williams, the mother of Strachan and who worked in the property department of the City of Miami Police Department, approached Cooper sometime in 1997 and provided Cooper with information that provided the basis for several questions on the note. However, Williams asked Cooper not to share the information because Williams did not want her son to be involved in the investigation. At the time, Cooper did not think the information was sufficient to identify any particular

suspect and incorrectly believed Strachan to be a minor, so she honored Williams's request. Cooper did not reveal the source of her information until 2008, when the note was brought to her attention again. When Borges learned that Strachan may have had information regarding the homicides, he and another officer flew to Arizona, where he then lived, to interview him.

In October 2008, the trial court held a suppression hearing regarding Calloway's confession that lasted several days and was continued until March 2009. At the conclusion of the hearing, the State and Calloway contested whether a Frye[6] hearing was necessary to determine whether Dr. Richard Ofshe, an expert witness in the field of false confessions, could testify for the defense. The trial court ruled that both Dr. Ofshe and Dr. Michael Welner, a rebuttal witness for the State, could testify, but only after Calloway himself testified that his confession was false. However, Calloway did not testify during the suppression hearing; therefore, neither doctor testified at that time.

### Guilt Phase

During trial, the State presented testimony from each of the officers who participated in the interrogation. In anticipation of Calloway's defense that his confession was false and "fed" to him by officers, the State presented evidence

---

6. Frye v. United States, 293 F. 1013 (D.C. Cir. 1923).

during its case-in-chief to counter that defense. Every officer who testified denied that anyone had threatened, coerced, or promised Calloway anything to obtain a confession. Additionally, each officer testified that Calloway did not request an attorney or otherwise invoke his <u>Miranda</u> rights.[7]

Detective Borges testified that some of the contemporaneous media coverage of the murders did not accurately portray certain details. He explained that he was familiar with many of the details from the January 1997 investigation that he did not disclose to Everett or Law before they obtained the confession. He also offered testimony that Calloway himself provided certain details that were unknown to officers in May 1998, but were later confirmed by Strachan, such as the fact that Calloway first encountered St. Charles downstairs. Further, Borges testified that Clark's fingerprints were found on the sticky side of certain pieces of duct tape, which confirmed both Clark's and Calloway's accounts that Clark taped the victims.[8]

Law denied that he or Everett "fed" Calloway specific details when they questioned him, or that they rehearsed anything with him before his statement was

_____

7. The videotaped testimony of Detective Everett, taken in 2003 before Calloway testified or Cooper disclosed Strachan as a witness, did not reference either an invocation of Calloway's <u>Miranda</u> rights or Cooper's note.

8. Clark did not testify during trial, but his statement, taken the day before Calloway was arrested, was used for impeachment purposes.

recorded. Law flatly denied that he "tricked [Calloway] into thinking he was a police agent" who would assist the detectives with the apprehension of the "real" murderers. Law also testified that that he did not recognize the note written by Cooper, nor did he remember it from their interrogation of Calloway.

Fabrice Nelson, the lead crime scene investigator in January 1997, testified with respect to evidence recovered from the apartment. Guillermo Martin, a latent fingerprint examiner, testified that latent prints lifted from the freezer door and the sticky side of duct tape pieces recovered from Apartment 8 matched those of Clark. Martin admitted that of the sixty-four latent fingerprint cards of value recovered, thirty-four cards remained unidentified, and none matched the known prints of Calloway. Over objections from the defense, the State also presented the testimony of medical examiner Dr. Bruce Hyma, in the place of Dr. Charles Siebert, the original medical examiner.

Latonya Taylor testified that she recognized her fiancé, Adolphus Melvin, by the underwear that he wore when he was killed, which she had purchased for him. She also described the jewelry that he usually wore, which, along with his wallet, cell phone, and beeper, she never saw after he left for the day on January 21, 1997. Gwendolyn James, the fiancée of Trenton Thomas, also testified that Thomas's pager was never found after that day. Adolphus Thornton, who knew Calloway as "Black" and was a friend of his nephew, Michael Gosha, testified that

Calloway approached him in January 1997 to pawn a distinctive gold bracelet. A few days later, Thornton learned that Melvin had been murdered and recognized the bracelet as belonging to him.

Strachan testified that in January 1997, he assumed the booming noises were music played from loud speakers; however, he had since served in the Marines and thought he recognized the noises to be the sounds of gunshots, although he could not definitely categorize the noises. After he informed his mother of what he had observed, his mother moved their family out of the apartment that very day and they did not return. After he testified that the person he saw in January 1997 seemed to be several years older than himself, he admitted that he was unable to identify Calloway in a photographic array during a police interview in 2008 or during trial in 2009.

The State also presented testimony from Diane Odom, Calloway's girlfriend at the time of his arrest. She testified that she saw Calloway after he confessed and drove with Calloway and the officers to search for the gun. On direct examination, she testified that Calloway did not tell her that her life was in danger when officers dropped her off with members of Calloway's family that day.

After the State rested, defense counsel proceeded on a theory that Calloway's confession was false and induced as part of a plan with the police to lure the real murderers from hiding. In support of this theory, defense counsel

presented testimony from Calloway and Dr. Ofshe, a sociologist who testified as an expert on factors that can cause a false confession.

Calloway's testimony conflicted with that of various police witnesses. For example, he testified that when he signed the <u>Miranda</u> paperwork upon his arrival at the police station, no one explained that he was under arrest or reviewed the protections of the <u>Miranda</u> rights. He also asserted that he requested an attorney several times from several different officers, and at one point, Borges retorted that "the devil in a suit" could not save him and he would "fry for this." He also claimed that Ford, rather than himself, stated that the victims were bad people who worked for the devil. Further, he testified that several officers provided him with nonpublic details about the murders, including that a robbery also occurred; the apartment was a marijuana packaging center; the victims were killed execution style; the stereo volume was high; and the weapon used was a .45 caliber gun.

After being left alone in the interview room, Calloway testified that Law returned at some point in the late night or early morning with a "glazed, crazy" look. Law said he had been speaking with the deceased Gosha, who told Law who had killed him. Calloway thought Law might have experienced a religious vision and replied that if Law had really spoken to Gosha, Gosha would have told him that Calloway was a good person who was not involved in the murders of either Gosha or the five men in 1997. Law returned sometime later, looking calmer, and

explained that the men who killed Gosha intended to target Calloway next. Law implied that Calloway and his family were under surveillance. However, Law said it would help Calloway if he made a false statement and to think about his family before declining this opportunity to help them. After speaking with Odom, Calloway agreed to provide a false confession to protect his family. He testified that he was under the impression that he would spend three months in jail so that the police could apprehend the real murderers. The State extensively impeached Calloway with an earlier interview between Dr. Ofshe and Calloway. Calloway defended inconsistent or incoherent statements by reference to his age at the time of the arrest (19), naivety, ignorance, use of slang, and lack of education.

Dr. Ofshe offered testimony regarding the manner in which a police interview may become a coercive interrogation that results in a confession. He explained that Calloway's account indicated the presence of many sources of "contamination," meaning that Calloway was potentially aware of evidence from either media accounts or the officers themselves. Dr. Ofshe offered his opinion that "[t]he quality of the interrogation was extremely poor throughout"; however, the trial court precluded him from further testifying whether it was his opinion that the confession was false. The court also ruled that Dr. Ofshe could not compare statements in Cooper's note and Strachan's testimony to Calloway's confession.

The State impeached Dr. Ofshe with inconsistences in the notes that Calloway provided to him before their interview. For example, when Dr. Ofshe interviewed Calloway in 2001, Dr. Ofshe told Calloway that it did not make sense that Calloway told the police he had fabricated the story about sending Clark to purchase duct tape, when Clark had recounted the same detail the day before Calloway was arrested. Dr. Ofshe admitted that he disregarded many of the details that Calloway recounted as too confusing until he learned about Cooper's note and the substance of Strachan's testimony.

Defense counsel also presented testimony from Rupert Butcher, a latent fingerprint examiner from the City of Miami Police Department. He testified that the duct tape collected from Apartment 8 was commingled and seized improperly.

During rebuttal, the State presented testimony from several witnesses who disputed Calloway's testimony. Law explained that he was only minimally involved with the 1997 quintuple homicides prior to Calloway's arrest and therefore could not have provided him with details about the homicides. Law and Borges denied that Borges told Calloway that he "would fry" for this and that a lawyer, "a devil in a suit," could not help him, or that they denied him an attorney upon his request. Law denied that he approached Calloway early on the morning of May 14 and told Calloway that he had spoken to Gosha in a dream, or that he arranged a deal with Calloway. The State also presented detectives from the

Miami-Dade County Police Department who had investigated the Twin robbery. Calloway testified that he was a victim of that robbery; however, Detective Pereira countered that Calloway admitted his involvement with that robbery.

Dr. Michael Welner, a psychiatrist, agreed that false confessions do occur, but emphasized that they are a rare phenomenon. He also explained that research has demonstrated that false confessions tend to be made more often by individuals who are compliant or suggestible, particularly those who suffer from mental illness or qualify as intellectually disabled. Dr. Welner stated that he had no evidence to indicate that Calloway was particularly compliant or suggestible, suffered from mental illness, or was actively psychotic at the time of his arrest and confession.

After a trial that lasted over two months, the jury returned a guilty verdict on all counts on July 30, 2009.

Penalty Phase

During the penalty phase, the State presented victim impact testimony from Dorothy White, the mother of Trenton Thomas; Katherine Lowe, the sister of Frederick McGuire; Carolyn Raphael, the sister of Gary St. Charles; Errol Kelly, the nephew of Adolphus Melvin; and Gloria Copeland, the mother of Derwin Copeland. The State then rested.

Diane Odom, Calloway's girlfriend at the time of his arrest, testified that Calloway helped her with her children during their relationship. He picked them

up from school, taught them how to play football and ride bikes, and spent three to five days a week with them.  Eugene Anderson, a relative to Calloway by marriage, explained that he occasionally hired Calloway to assist him with his carpet installation business and that Calloway gave his earnings to Eugene's wife, Shante, for their children.

Joan King and Juanita Perry testified that before his arrest, Calloway regularly attended church.  In addition to attending services three times a week, he participated in youth activities, helped clean the church, and served as an usher.

Eugene Hill, Calloway's step-grandfather, provided testimony about Calloway's impoverished childhood.  His stepdaughter and Calloway's mother, Shirley Hill, moved to Miami to live with him and his wife, Hester Hill.  Eugene tried to provide for Calloway and his brother, Reginald, and to discipline them, but he was eventually injured and was unable to continue to support Shirley and her family.

Shante Anderson, Calloway's second cousin, testified regarding Calloway's difficult childhood.  When Calloway's mother moved her children to Liberty City, they lived in a crowded two-bedroom apartment with Eugene and Hester Hill, Cherry Hill, and Cherry's two children.  Eugene was strict and threatened to discipline the children with his belt.  After Shirley moved out of the apartment when Calloway was approximately thirteen years old, she, Calloway, and Reginald

were evicted at least twice from various apartments around Liberty City. It was rare that Shirley kept more than milk and cereal to feed Calloway and Reginald. Calloway would visit his grandparents' home, where Hester would feed him without Eugene's knowledge or permission.

Reginald Calloway further testified to the hardships he and his brother endured. He stated that Eugene frequently beat Calloway with a belt during the time they lived with him and their mother was largely absent during this time. Despite the difficulties, Calloway encouraged his brother to stay in school and served as a surrogate father figure.

Calloway's mother, Shirley, explained that she was often abused by Solomon Calloway, the father of Calloway and Reginald, and that he once attempted to drown her in a bathtub. When Calloway was one or two years old, she moved her children to a small, one-bedroom trailer in Georgia. Despite the move, Solomon visited the trailer and beat Shirley with a switch nearly every day. Solomon would also beat Calloway with the switch. She recounted one incident when she and Solomon were fighting and Calloway, then a toddler, handed her a bat to use in self-defense. The abuse continued until she moved to Miami to live with her mother and stepfather, when Calloway was five or six years old.

After she moved out of their home and into a one-bedroom apartment with her sons, she spent her income on drugs, rather than rent, electricity, groceries, or

other basic needs for her children. When Calloway was approximately fourteen, she moved the family again, this time to the Scott Projects, which she described as a "war zone" where drugs were openly sold and fights occurred regularly. Her drug abuse intensified, and she testified that at that point in her life, nothing but crack cocaine mattered to her, not even her children. Instead of using food stamps to feed her children, she traded the food stamps for drugs.

On February 3, 2010, the jury recommended the death penalty for all five murders, each by a vote of seven to five. On April 13, 2010, the court held a Spencer[9] hearing. Dr. Jethro Toomer, a clinical psychologist, testified for the defense. Dr. Toomer explained that the instability, poverty, and parental abandonment that Calloway experienced throughout his life affected his cognitive processing, impulse control, and ability to engage in personal relationships. However, Dr. Toomer admitted that Calloway's participation in planning the robbery and murders demonstrated that he was capable of controlling his impulses.

The trial court issued its sentencing order on October 1, 2010. The court concluded that the State had established beyond a reasonable doubt the existence of six aggravating circumstances: prior conviction of a capital felony, § 921.141(5)(b), Fla. Stat. (1997) (great weight); capital felony committed in the

_____

9. Spencer v. State, 615 So. 2d 688 (Fla. 1993).

- 25 -

course of a kidnapping, § 921.141(5)(d) (great weight); capital felony committed for the purpose of avoiding arrest, § 921.141(5)(e) (great weight); capital felony committed for pecuniary gain, § 921.141(5)(f) (great weight); capital felony was heinous, atrocious, or cruel (HAC), § 921.141(5)(h) (exceptionally great weight); and capital felony was committed in a cold, calculated, and premeditated manner (CCP), § 921.141(5)(i) (extremely great weight).

The court found one statutory mitigating circumstance, Calloway's age at the time of the murders, section 921.141(6)(g), Florida Statutes, and gave it some weight. The court also acknowledged the existence of the following nonstatutory mitigating circumstances: Calloway had an unstable and impoverished background (slight weight); he was often abandoned by his mother, who was a crack addict (some weight); as a very young child, he witnessed his father physically abuse his mother (slight weight); he demonstrated poor performance in school, has a low-normal IQ, and dropped out of school (minimal weight); he grew up in the Scott Projects, a rough neighborhood rife with narcotics and violence (slight weight); he suffered emotional deprivation at the hands of his caregivers, his mother and step-grandfather (little weight); he was exposed to chronic violence throughout his life (little weight); he was deprived of a nurturing mother (little weight); he grew up in abject poverty (slight weight); he was born into a dysfunctional family (minimal weight); he became normalized to violence (little weight); he lacked guidance and

a father-son relationship (slight weight); he lacked a role model (no weight); he faced unstable living conditions throughout his life (little weight); he was active in his church and exhibited genuine religious beliefs (no weight); his aunt and grandmother passed away while he was in jail, and he was upset because he was unable to attend their funerals (no weight); he did not flee from the police (no weight); his mother still loves him (no weight); he was a good father figure to the children of his former girlfriend, Diane Odom (some weight); he encouraged his cousins to do well (minimal weight); he is considerate, generous, and concerned about his family (some weight); he will die in prison regardless of what sentence he receives (no weight); the police would not have solved the crimes if he had not confessed (some weight); Clark, his codefendant, was sentenced to life imprisonment (no weight); he did not receive recommended psychological counseling (some weight); he was employed at the time of his arrest (slight weight); and he used poor judgment and engaged in impulsive behavior (minimal weight).[10]

---

10. The court determined that Calloway did not present mitigating evidence that the capital felony was committed while he was under the influence of a mental or emotional disturbance. The court also rejected his claim that it should consider as a mitigating circumstance that he was a follower, when "[t]he evidence proved that he was clearly a leader in the commission of these crimes."

The court concluded that the aggravating circumstances, particularly HAC and CCP, far outweighed the mitigating circumstances. The trial court sentenced Calloway to death for the murders, and imposed life sentences for the armed robbery, armed kidnapping, and armed burglary with an assault or battery convictions. This appeal follows.

## DISCUSSION

### Voir Dire

The first error that Calloway alleges is that the trial court improperly limited the scope of voir dire. Specifically, defense counsel sought to ask potential jurors whether they would consider a life recommendation when faced with five murder victims and the anticipated multiple aggravating circumstances. During a hearing on this issue, the defense argued that they would be unable to explore juror bias and intelligently exercise preemptory strikes without these questions. The State generally agreed that the defense should be permitted to ask whether jurors would commit to weighing the aggravating and mitigating circumstances. However, the State contended that defense counsel should not be permitted to attempt to commit the jurors to a predetermination by asking if jurors could still consider life after hearing about multiple certain aggravating circumstances, which would convert voir dire into a pretrial of the case.

The trial court explained that prospective jurors had been asked whether they could commit to fairly weighing aggravating and mitigating circumstances before making their recommendation. When defense counsel responded, "The problem is, they don't know what the aggravators are yet," the court answered, "That's the way it is," and reminded defense counsel that the jurors are given similar instructions before deliberation. Defense counsel replied:

> I don't want to find out their attitude towards applying that instruction at the end of the case. It's too late for me to have explored whether they would be overwhelmed by [preconceived] notions of bias against [heinous], atrocious, and cruel.
> A case where someone tortured someone[,] tied them up and subject[ed] them to pain, no, I can't give them life. I need to know that at the beginning because they don't know what the aggravators are going to be, either the law or the potential factual scenario. And if they would be overwhelmed that they can't apply the law or they have a bias such that I would use a pre-emptory, I need to know about it in jury selection.

The court stated that defense counsel had failed to present any authority to support that position, and the jury should not be requested to engage in pretrial determinations. It ultimately concluded that the parties could probe the venire about potential bias regarding the number of victims and the potential for financial gain, given that the indictment included the armed robbery charge.

This Court will not disturb a ruling of a trial court regarding the scope of voir dire absent a finding of an abuse of discretion. E.g., Chamberlain v. State, 881 So. 2d 1087, 1095 (Fla. 2004). This standard is only met if no reasonable person

- 29 -

would arrive at the same conclusion as that of the trial court. <u>Trease v. State</u>, 768 So. 2d 1050, 1053 n.2 (Fla. 2000) (citing <u>Huff v. State</u>, 569 So. 2d 1247, 1249 (Fla. 1990)). This Court has previously found no abuse of discretion in the exclusion of questions pertaining to potential jurors' familiarity with stories about prisoners who had been released from death row, or their views regarding mitigation. <u>Darling v. State</u>, 808 So. 2d 145, 160 (Fla. 2002); <u>Vining v. State</u>, 637 So. 2d 921, 926-27 (Fla. 1994); <u>see also</u> <u>Hoskins v. State</u>, 965 So. 2d 1, 13 (Fla. 2007) (finding no abuse of discretion in excluding the use of autopsy photographs during voir dire). However, we have held that an abuse of discretion occurred when a trial court prevented defense counsel from questioning prospective jurors about whether they would accept voluntary intoxication as a defense in a case that required specific intent to be established. <u>Lavado v. State</u>, 492 So. 2d 1322, 1323 (Fla. 1986); <u>see also</u> <u>Johnson v. State</u>, 590 So. 2d 1110, 1110 (Fla. 2d DCA 1991) (trial court abused its discretion in excluding questions about defendant's status as a convicted felon to probe for potential bias).

It is a well-settled principle in Florida that parties may not question potential jurors during voir dire about evidence that is expected to be presented during trial and request an initial decision from prospective jurors as to how they will rule in the case. <u>Hoskins</u>, 965 So. 2d at 13 ("The purpose of voir dire is to obtain a fair and impartial jury, whose minds are free of all interest, bias, or prejudice, not to

shock potential jurors or to obtain a preview of their opinions of the evidence." (citations omitted)); Franqui v. State, 699 So. 2d 1312, 1322 n.5 (Fla. 1997) (citing Vining, 637 So. 2d at 921; Dicks v. State, 93 So. 137, 138 (Fla. 1922)). "Such a procedure would revolutionize jury trials." Dicks, 93 So. at 137.

We distinguish this case from Lavado, which involved whether the jury could accept the theory of the defense. In Barnhill v. State, 834 So. 2d 836, 846 (Fla. 2002), this Court explained how such a question was critical to the defendant's right to a fair trial:

> If counsel knows nothing more of the jurors, the single thing defense counsel must ascertain is whether the prospective jurors can fairly and impartially consider the defense offered by the defendant. See Lavado v. State, 492 So. 2d 1322 (Fla. 1986). A trial judge abuses his or her discretion if he or she precludes counsel from asking specific questions about bias or prejudice against the defendant or the defense theory, even if the judge permits the general question as to whether the prospective juror can follow the law. Id.

(Emphasis supplied); see also Johnson, 590 So. 2d at 1110. Unlike the circumstances in Lavado or Johnson, the questions here pertained to obtaining a pretrial decision on anticipated aggravating circumstances that could only be explained through a discussion of the underlying facts, rather than an aspect of Calloway or his theory of the case. Therefore, neither Lavado nor Johnson provides support for Calloway's proposition that the trial court abused its discretion.

Here, defense counsel sought to precommit jurors to a recommendation of a life sentence based on expected evidence. Calloway asserts that the trial court's exclusion of such questions was inconsistent with a subsequent ruling that permitted questions regarding the number of victims and the potential pecuniary gain aggravating circumstance. However, the court explained that the potential jurors were aware of the number of victims and that the murders had occurred during the course of a robbery because they had been informed of the crimes with which Calloway had been charged. What they had not been informed of at that time were the particular facts of the crime—namely, that the victims had been duct-taped, blindfolded, and gagged while they listened to Calloway and Clark debate whether to kill some or all of them. The trial court permitted defense counsel to ask hypothetical questions about jurors' general views on aggravation; however, defense counsel could not ask them whether they would precommit to a life sentence in light of specific aggravating circumstances. Such questions would have pretried the case in voir dire. See Hoskins, 965 So. 2d at 13; Franqui, 699 So. 2d at 1322 n.5. Therefore, we conclude that the trial court did not abuse its discretion when it issued the one limitation.

## Whether a Frye Hearing Was Necessary

On cross-appeal, the State claims that the trial court erred when it failed to conduct a Frye hearing before it allowed Dr. Ofshe to testify as an expert.[11] The State contends that had a Frye hearing been held, Dr. Ofshe would not have been permitted to testify as an expert. During a pretrial suppression hearing in 2008, the State insisted that Dr. Ofshe be subject to a Frye hearing before he could testify. However, the trial court ruled that his testimony would not become relevant until Calloway testified that his confession was false. Calloway did not testify until trial in 2009, and the trial court ruled that a Frye hearing would not be held at that point, based on United States v. Hall, 93 F.3d 1337, 1342 (7th Cir. 1996), and Boyer v. State, 825 So. 2d 418 (Fla. 1st DCA 2002).

Under the Frye standard, the proponent of the evidence sought to be admitted must prove to the trial court by a preponderance of the evidence that the scientific principles and methodology of the expert witness are generally accepted by the relevant scientific community. Marsh v. Valyou, 977 So. 2d 543, 547 (Fla. 2007); Ramirez v. State, 810 So. 2d 836, 844 (Fla. 2001). Frye hearings only apply to novel scientific methodologies; once the methodology has been established and recognized by the relevant scientific community, a Frye hearing becomes unnecessary. See, e.g., King v. State, 89 So. 3d 209, 228-29 (Fla. 2012)

_____

11. The Frye standard was in place at the time of Calloway's trial in 2009.

(concluding that tool-mark identification did not require a Frye hearing). Frye determinations are legal rulings that are reviewed de novo. Brim v. State, 695 So. 2d 268, 274 (Fla. 1997). Frye errors are subject to being reviewed for harmless error. Ramirez, 810 So. 2d at 845 (citing Hadden v. State, 690 So. 2d 573, 581 (Fla. 1997)). An error is harmless if there is no reasonable possibility that it affected the verdict. State v. DiGuilio, 491 So. 2d 1129, 1135 (Fla. 1986).

In Flanagan v. State, 625 So. 2d 827, 828 (Fla. 1993), this Court explained that not all expert testimony requires a Frye hearing:

> [P]ure opinion testimony, such as an expert's opinion that a defendant is incompetent, does not have to meet Frye, because this type of testimony is based upon the expert's personal experience and training. While cloaked with the credibility of the expert, this testimony is analyzed by the jury as it analyzes any other personal opinion or factual testimony by a witness. Profile testimony, on the other hand, by its nature necessarily relies on some scientific principle or test, which implies an infallibility not found in pure opinion testimony. The jury will naturally assume that the scientific principles underlying the expert's conclusion are valid. Accordingly, this type of testimony must meet the Frye test, designed to ensure that the jury will not be misled by experimental scientific methods which may ultimately prove to be unsound. See Stokes[ v. State, 548 So. 2d 188], 193-194 [(Fla. 1989)] ("A courtroom is not a laboratory, and as such it is not the place to conduct scientific experiments. If the scientific community considers a procedure or process unreliable for its own purposes, then the procedure must be considered less reliable for courtroom use.").

(Emphasis supplied.) We subsequently concluded that based upon the reasoning in Flanagan, a Frye hearing must be held before an expert could testify about the psychological effects of sexual abuse upon a child. Hadden, 690 So. 2d at 579-80.

We have also previously considered whether Dr. Ofshe's testimony requires a <u>Frye</u> hearing before it may be presented to a jury. In <u>Williamson v. State</u>, 994 So. 2d 1000, 1007-08 (Fla. 2008), the prosecution theorized that the defendant threatened a key State witness, Charles Panoyan. In support of this theory, Dr. Ofshe testified for the State that the threats made by Williamson indicated a degree of control or influence over Panoyan. <u>Id.</u> at 1009. The following exchange occurred during trial:

> Q. [The State] But did you have the opportunity to discern any kind of control or influence that had been exercised by Dana Williamson according to the attestation of Charles Panoyan, which degrees or kinds of control you recognized?
>
> A. [Dr. Ofshe] Yes.
>
> . . . .
>
> Well, in reviewing the history of Mr. Panoyan's experience in connection with the invasion and death and the assaults at the Decker residence, and over the course of the investigation that followed, including his incarceration and ultimate decision to speak about what happened, the pattern that he displays is a pattern of someone who has, for one [sic] of a better word, been terrorized, and <u>someone who is acting in response to a credible threat, not only to himself, but also, and to some degree, more importantly, to members of his family</u>.
>
> And that the manner in which he responds at various points indicates quite clearly that he has a great concern about something happening to his family . . . .
>
> . . . .
>
> The point at which he chose to do certain things reflects the kind of threat and fear he was acting under, and the particular

- 35 -

decisions that he made to me are completely consistent with what he says about the sort of threats that he was exposed to.

Id. (emphasis supplied). The postconviction court summarily denied Williamson's claim that trial counsel was ineffective for failure to request a Frye hearing before Dr. Ofshe testified. Id. However, on appeal we explained that the court should have determined whether Dr. Ofshe's testimony regarding the effect of the defendant's coercion on the witness was generally accepted by the relevant scientific community. Id. at 1010 (citing Hadden, 690 So. 2d at 575-76; Flanagan, 625 So. 2d at 828). We concluded that the summary denial of the claim was error and remanded to the postconviction court for an evidentiary hearing. Id.

In this case, we hold that under Williamson, a Frye hearing was necessary before Dr. Ofshe was permitted to testify. Although Calloway asserts that the testimony in Williamson is factually distinguishable from the testimony presented below, we disagree. In both Williamson and this case, Dr. Ofshe's testimony ultimately concerned how coercion in the form of threats made to an individual or his family can influence that individual's behavior. Moreover, we have explained that the testimony involved in both Williamson and Hadden involved expert testimony that was more than pure opinion evidence and therefore required a Frye hearing. Williamson, 994 So. 2d at 1010; see also Flanagan, 625 So. 2d at 828 ("Profile testimony, on the other hand, by its nature necessarily relies on some scientific principle or test, which implies an infallibility not found in pure opinion

- 36 -

testimony."). As in <u>Williamson</u>, <u>Hadden</u>, and <u>Flanagan</u>, Dr. Ofshe's testimony consisted of more than a pure opinion from an expert. In fact, Dr. Ofshe was not permitted to offer an opinion as to whether Calloway's confession was false, coerced, or otherwise unreliable, but instead only explained that false confessions occur and what factors might produce a false confession. This evidence was supported by research referenced by Dr. Ofshe during his testimony and included a discussion of the rate of occurrence of false confessions and his model of false confessions. His testimony therefore relied upon a scientific or academic principle or test, which constitutes evidence that requires a review of its underlying methodology and acceptance before it can be presented to a jury. <u>See</u> <u>Williamson</u>, 994 So. 2d at 1009-10; <u>Hadden</u>, 690 So. 2d at 575-76; <u>Flanagan</u>, 625 So. 2d at 828.

However, this error was harmless. The primary witnesses for the defense were Calloway and Dr. Ofshe, whose testimony lent academic credence to Calloway's claim that he was pressured by the police to give a false confession. The central issue of the case was whether Calloway provided a false confession out of fear for himself and his family. Even assuming that the trial court would have entirely excluded testimony from Dr. Ofshe after a proper <u>Frye</u> hearing—which we do not conclude today[12]—the jury nonetheless convicted Calloway of five counts

12. Because no <u>Frye</u> hearing occurred below, we decline to address whether Dr. Ofshe's testimony would have satisfied the <u>Frye</u> standard.

- 37 -

of first-degree murder, armed robbery, armed kidnapping, and armed burglary, after it heard extensive testimony from Dr. Ofshe that the confession may have been the product of coercion and an illicit deal with law enforcement. The State does not allege any harm suffered by this error. Under these circumstances, we conclude there is no reasonable possibility that the failure to conduct a Frye hearing prior to Dr. Ofshe's testimony ultimately affected the verdict.

Limitations on Testimony of Dr. Ofshe

The next error that Calloway alleges occurred is that the trial court so limited the testimony of Dr. Ofshe that it was rendered meaningless. To demonstrate that Calloway's confession was false and coerced, defense counsel sought to introduce Dr. Ofshe's methodology, which requires a comparison between objective facts available beyond what is revealed in a confession and the "facts" developed during the confession. Dr. Ofshe was permitted to explain at length and with few interruptions how an interrogation occurs and what factors an interrogator might use to obtain a confession. During redirect, he was also allowed to discuss studies that examined false confessions and tactics that might induce a false confession. He further stated that he saw the existence of "powerful motivators" that were likely to induce a false confession in Calloway's account of the interrogation. However, the court prevented Dr. Ofshe from comparing what he called "objectively knowable facts," such as the information available from Strachan's

testimony and Cooper's notes, with the "facts" in Calloway's confession. The trial court explained that both the "facts" as framed by Dr. Ofshe and his assessment of witness credibility were matters for the jury.

We review evidentiary rulings by a trial court for abuse of discretion. Frances v. State, 970 So. 2d 806, 813-14 (Fla. 2007). An expert may testify about an opinion developed from facts not in evidence before the jury. § 90.704, Fla. Stat. (1997). However, experts may not comment on the credibility of other witnesses. Frances, 970 So. 2d at 814; Feller v. State, 637 So. 2d 911, 915 (Fla. 1994). This limitation is intended to minimize any effect that the expert status of the witness may have on the jury's reception of the testimony. See Feller, 637 So. 2d at 915; State v. Townsend, 635 So. 2d 949, 958 (Fla. 1994) ("[G]reat care must be taken by a trial judge in determining what testimony of an expert is admissible because a jury often places great emphasis on the testimony of experts . . . .").

In Frances, an expert attempted to testify about the defendant's general knowledge and comment on the credibility of other witnesses. 970 So. 2d at 814. We found no abuse of discretion in excluding such testimony. We noted that expert testimony that did not require specialized knowledge was not admissible, and experts cannot vouch for other witnesses. Id. However, in Boyer, the First District concluded that the wholesale exclusion of Dr. Ofshe's testimony regarding false confessions was harmful error. 825 So. 2d at 419-20. The district court

concluded that the jury should have been allowed to consider evidence relevant to the voluntariness of the defendant's confession, and the jury was free to determine the credibility of Dr. Ofshe's testimony. Id.

However, Dr. Ofshe's excluded testimony here would have exceeded the scope of the testimony contemplated in Boyer. Without the limitations imposed by the trial court below, his testimony would have evaluated the credibility of his fellow witnesses, which is not permitted. Frances, 970 So. 2d at 814; Feller, 638 So. 2d at 915. Unlike in Boyer, Dr. Ofshe was allowed to testify and explain how false confessions might occur. Where the trial court drew the line was when Dr. Ofshe attempted to compare different versions of the facts to each other to suggest that the version provided by Calloway in his confession was not reliable. Allowing Dr. Ofshe to explain that he determined that Calloway's confession was false because it conflicted with Strachan's descriptions of what he observed on January 21, 1997, would have exceeded the permissible scope of expert testimony.[13] His opinion was not simply based upon facts and observations not before the jury, but instead relied upon his assessment of the credibility of witnesses and evidence that were before the jury. Such testimony would allow Dr. Ofshe, not the jury, to

_____

13. Dr. Ofshe himself admitted that he did not fully understand Calloway's confession and description of his confession in their 2001 interview until after he learned about Strachan's observations and Cooper's note several years after the interview.

determine which version of the facts was correct by implying that Strachan provided a more reliable account than Calloway himself provided to the police after his 1998 arrest.  See Frances, 970 So. 2d at 814.  Therefore, we conclude that the trial court did not abuse its discretion when it placed these specific limitations on the testimony of Dr. Ofshe.

## Cross-Examination of Odom

Calloway next alleges that the trial court improperly limited the scope of cross-examination of Diane Odom, who was Calloway's girlfriend at the time of his arrest and who testified during the State's case-in-chief.  Calloway spoke to Odom on the phone on the morning of his confession, and she came to the police station that morning at his request.  She also rode in the van with Calloway and Detectives Law and Everett while they toured areas that Calloway visited before and after the murders.  Calloway proffered that he told Odom that he was concerned for her safety and that of her family, and in response, she temporarily relocated her family.  According to Calloway, this demonstrated the validity of the threats revealed by Detective Law before Calloway confessed.

The record does not reflect the exact date of this alleged communication.  Before trial, the State suggested that Calloway communicated these threats to Odom two weeks after his arrest.  However, during trial, defense counsel proffered that Calloway informed Odom of the threats during the phone call on the morning

- 41 -

of his confession. Calloway himself offered conflicting testimony on this matter. During direct examination, he testified that when he saw her at the police station shortly after he confessed, he told her he needed to "get right with God," and that he had a deal with Detective Law that would resolve everything within three months, but he did not tell her about the threats because he did not want her to panic. During redirect examination, however, defense counsel elicited that Calloway had communicated concerns for her safety at some point that day, and she temporarily moved out of her apartment immediately.

During direct examination, the State asked Odom if she was afraid for her life when she left Calloway, Everett, and Law after the van ride:

> Prosecutor: Were you at that time, Ms. Odom told by Tavares Calloway that your life could be in danger?
>
> Odom: No. Not at that time, no.
>
> Prosecutor: Were you told you needed to be careful and watch out at that time?
>
> Odom: No. I don't remember at that time. No. Not at that time.

(Emphasis supplied.) The court sustained objections from the State when defense counsel asked Odom during cross-examination what she was afraid of when she stayed with family members of Calloway for two weeks following his arrest. Defense counsel argued that the earlier answer from the State's direct examination opened the door to other statements made by Calloway to Odom that showed that

- 42 -

she was afraid. The court ruled that the witness herself added the words, "not at that time," which did not amount to a door being opened to further questioning about hearsay statements made between Calloway and Odom. The court also noted that Calloway was free to recall Odom during his case, which did not occur. Calloway now asserts that these limitations were improper.

Self-serving hearsay statements are generally inadmissible. Kaczmar v. State, 104 So. 3d 990, 1000 (Fla. 2012) (citing § 90.803(18), Fla. Stat. (2007)). However, if a partial statement, writing, or recording is admitted, the rule of completeness permits the opposing party to introduce other portions of that same statement, writing, or recording in the interest of fairness. Id. (citing § 90.108(1), Fla. Stat. (2007));[14] Reese v. State, 694 So. 2d 678, 683 (Fla. 1997) (explaining that the statutory rule of completeness, which only governs writings or recordings, has been applied to testimony). This rule is not an absolute right, but rather a matter of fairness that falls within the discretion of the trial court. Larzelere v. State, 676 So. 2d 394, 402 (Fla. 1996). The trial court should consider the relative reliability of the complete statement in its ruling on the admissibility of the full statement. Jordan v. State, 694 So. 2d 708, 712 (Fla. 1997).

---

14. Neither section 90.803 nor section 90.108 has been substantially altered since 1997, the year of these crimes.

In Reese, the defendant alleged that the trial court improperly restricted his cross-examination of a witness. 694 So. 2d at 683. The witness testified during direct examination that she visited the defendant in jail after he had been arrested and he confessed to her. However, the defendant was not permitted to ask her about prior jailhouse conversations between them, in which she allegedly refused to speak to the defendant until he confessed to her. We approved the ruling of the trial judge, who indicated that the defendant was free to recall the witness during his case. Id. at 683-84. We held that the rule of completeness was not violated after noting that the conversations were not directly related to each other and were separated by several weeks in time. Therefore, we concluded that no abuse of discretion occurred. Id.

As in Reese, the statements about the purported threats that would complete the allegedly misleading testimony of Odom may have been separated by several weeks in time. The State indicated that Calloway informed Odom of these threats two weeks after his arrest, not on the morning of May 14. Calloway also testified that he did not communicate the threats on the morning of May 14 because he did not want her to panic. However, Calloway later testified during his redirect examination that Odom moved out of her home on May 14, suggesting to the jury that the threats may have been contemporaneously communicated to Odom. This separation in time and apparent contradiction by Calloway as to when he informed

Odom not only render it less likely that the admission of Calloway's complete statement would provide proper context for the jury, but also suggest that his statement is not entirely reliable. Reese, 694 So. 2d at 683-84; Jordan, 694 So. 2d at 712 ("The amount of time that passed between Jordan's first statement and his second statement only increases the unreliability of the hearsay."). Moreover, Calloway was free to recall Odom in his defense and chose not to do so. Therefore, we conclude that the trial court did not abuse its discretion to limit the cross-examination of Odom.

### Admission of Collateral Criminal Conduct

Calloway next claims that the State improperly admitted two instances of collateral criminal conduct without proper foundation. According to Calloway, the State first improperly impeached him with evidence of a prior arrest for carrying a concealed firearm. During his direct testimony, Calloway explained that he mixed up the terms "clip" and "hammer" during his statement to Law and Everett, and the officers corrected him. Calloway stated, "I fired five shots and I had two left in the hammer. See there go my ignorance right there. I said [hammer]. So I'm thinking revolver. When he obviously just said clip and I tried to catch, I mean he like, you know the clip. And I'm like, yeah, yeah, yeah, the clip." (Emphasis supplied.)

The trial court agreed with the State that Calloway placed his character and knowledge of weapons at issue with this statement and allowed the State to ask

- 45 -

Calloway if he possessed a .38 caliber firearm on February 2, 1996, which he admitted was true. The State also asked him whether he was charged with carrying a concealed firearm as a result of that possession, which Calloway also admitted was true.

He also alleges that the State improperly impeached him about his involvement in the Twin robbery with Gosha. During his interrogation, Calloway admitted that he and Gosha planned to rob Twin, and that Gosha was murdered a few days after the robbery. Calloway was initially considered a witness in the Gosha homicide and informed officers that he suspected Gosha was killed in retaliation for the Twin robbery. Before trial, the parties stipulated that they would not discuss the Gosha homicide before the jury.

Calloway testified on direct examination that when he was first brought to the police station, he was under the impression that he would sign some paperwork with regard to the bench warrant, offer the police assistance with the Gosha investigation, and be free to leave. He explained Gosha was a friend who drove a nice car, but he did not judge Gosha for choices that Gosha had made in his life. Later, when Law entered the room on the morning of May 14, 1998, to resume questioning, Calloway testified that Law had a "zombie like" look upon his face and told Calloway that he had spoken to Gosha in a dream. Calloway replied:

> [W]ell maybe if you talk to [Gosha], he can tell you about my character. He can tell you what's going on with me. He can tell you,

man I'm not that type of individual.  He can tell you who killed him. He can tell what's going on and he can also tell you I'm not that type of person.

He also testified that he fabricated certain details about the homicides and robbery based on what he had seen in movies because he would not know how to rob someone.  Furthermore, when he created the false confession allegedly in collusion with Law and Everett, he admitted that he knew Melvin, St. Charles, and Thomas, and that if he had simply robbed them, they would have been able to identify him. However, he added, "Anyone who knows me knows, you know you ain't got to worry about me because I wasn't living that type of life style.  Not in the form of aggressive, ruggish, thuggish type of individual."  He also described himself as a hardworking individual who attended church regularly and helped supervise his girlfriend's children.

In rebuttal, the State recalled Law and Pereira to challenge Calloway's account.  The court agreed with the State that Calloway opened the door to further questioning about Gosha's homicide and the robbery they had planned together. Law testified that Calloway admitted that he and Gosha planned the Twin robbery, during which Calloway pretended to have been a victim along with Twin.  Pereira, who was part of the investigation team from the Miami-Dade County Police Department regarding the Twin robbery, confirmed Calloway's involvement in

that robbery.[15]  Before Law and Pereira were recalled in rebuttal, the trial court instructed the jury to only consider their testimony to evaluate witness credibility and that Calloway was not on trial for any crimes beyond those enumerated in the indictment.  Before this Court, Calloway asserts that the repeated references to collateral criminal conduct resulted in prejudicial error.

A party can "open the door" to otherwise inadmissible evidence through testimony from a witness.  Rodriguez v. State, 753 So. 2d 29, 42-43 (Fla. 2000).  In the interests of fairness and "the truth-seeking function of a trial," the opposing party may in turn present inadmissible evidence that qualifies, explains, or limits previously admitted evidence.  Id.  We have approved of the admission of evidence of prior criminal conduct to impeach a defendant who has opened the door to such evidence.  Id. at 42.  This door is only opened after the defendant presents misleading testimony, at which point the State may present evidence of prior criminal conduct to prevent the jury from being misled as to the defendant's character.  Robertson v. State, 829 So. 2d 901, 913 (Fla. 2002) (citing Bozeman v. State, 698 So. 2d 629, 630 (Fla. 4th DCA 1997)).  However, such evidence should

---

15.  The State also presented Detective William Hladky from the Miami-Dade County Police Department, who was the lead investigator on the Twin robbery, but was out of town when Calloway was arrested.  Pereira filled in during Hladky's absence and was called to the City of Miami Police Department during Calloway's interrogation.  As far as Hladky knew, Calloway was simply a witness to the robbery.

be cautiously admitted, due to concerns that it may unfairly prejudice the defendant. Rodriguez, 753 So. 2d at 42 ("The issue is not always whether the door has been opened, but rather how wide it has been opened."). Moreover, a criminal defendant who chooses to take the stand subjects his or her own credibility to impeachment by the prosecution. Butler v. State, 842 So. 2d 817, 827 (Fla. 2003) (noting that a defendant who testified on direct examination that he would never hurt the victim could be impeached about a prior incident in which he choked the victim).

We agree with the trial court that Calloway opened the door to impeachment by the State on both of these issues. With respect to his prior arrest for carrying a concealed weapon, Calloway broadly claimed to be "ignorant" about guns. To prevent the jury from being misled about his familiarity with guns, the court permitted the State to ask whether he previously possessed and had been arrested for carrying a .38 caliber concealed firearm. However, the court narrowly tailored the admission of evidence of prior criminal conduct to Calloway's familiarity with guns, which was a matter that he himself introduced, and excluded further evidence of his arrest record, which included more than a dozen arrests in the six years prior to the arrest in this case. See Butler, 842 So. 2d at 827; Rodriguez, 753 So. 2d at 42-43. The trial court did not abuse its discretion when it permitted this narrow inquiry into his prior criminal activities.

Likewise, Calloway opened the door to cross-examination about his participation in the Twin robbery. He stated several times on direct examination that he would not know how to commit a robbery and he was not the sort of individual who would engage in violent criminal activity such as robbery or homicides. He also testified that early in the interrogation, he offered to help officers with the Gosha investigation. However, witnesses for the State explained that he actually told them that he and Gosha planned the robbery; as part of that plan, he pretended to be a victim of the robbery; and Gosha was probably murdered in retaliation for that crime. Calloway chose to testify in his defense, and his credibility became a critical issue in this case. We therefore conclude that he placed his credibility at risk of impeachment. See Butler, 842 So. 2d at 827. Accordingly, we find no abuse of discretion by the trial court.

Impeachment by Statement from Nontestifying Codefendant

Calloway also claims that the State violated his rights under the Confrontation Clause when he was impeached by statements made by his codefendant, Clark, who did not testify during Calloway's trial. The day before Calloway was arrested, Clark was arrested and confessed that both he and Calloway were involved in the 1997 homicides. He also admitted that Dwight Campbell directed them to rob the victims, but he did not expect that anyone would be killed. He told officers that Calloway sent him to the store during the robbery to

- 50 -

purchase the duct tape that was used to bind and gag the victims. He also stated that Calloway ordered the victims to remove their clothing to ensure that none of them was armed. Finally, Clark told them that Calloway was the sole shooter.

During his confession, Calloway provided a substantially similar account to detectives, which was admitted into evidence during the State's case-in-chief. Calloway admitted that he directed Clark to purchase something to restrain the victims, and that when Clark ran out of duct tape, he sent Clark back to the store to purchase more. He also admitted that he was the shooter. However, Calloway testified during direct examination that he could not remember if he had fabricated these details, or if officers "fed" him this information in their quest to implicate Campbell via Calloway's confession.

Before Dr. Ofshe interviewed Calloway in 2001, he asked Calloway to write down his account of the interrogation and confession. In the interview, Calloway told Dr. Ofshe that he fabricated details that involved Clark during his confession. Dr. Ofshe was aware that Clark had provided the police with a similar statement and told Calloway it seemed unlikely that he could make up such details that were previously provided to the police by Clark. He testified that he told Calloway to "think about it and see what it is that he actually knows and what it is that he's just telling me."

During his direct examination, Dr. Ofshe indicated that Calloway could have learned of certain details provided in his confession either from local media or from the interrogating officers. During cross-examination, the State asked a series of questions about whether contradictory statements make a confession more or less reliable, according to Dr. Ofshe's theory of false confessions. The State asked whether Dr. Ofshe was aware that Clark had previously informed officers that he and Calloway sought direction from Campbell, or that Clark purchased duct tape on Calloway's instructions. Dr. Ofshe admitted that it would be highly unlikely that Clark would provide the same details the day before Calloway allegedly fabricated them. He testified that the contradiction did not necessarily make Calloway's account less reliable, but he admitted that when he pointed out the potential inconsistency, Calloway became less understandable in their interview. He also agreed with the State that Clark's confession contradicted Calloway's earlier statement that officers told Calloway to include them as a means to inculpate Campbell. Dr. Ofshe ultimately agreed that his opinion regarding Calloway's confession would change if it was proven that Calloway had lied to him about a significant matter.

Calloway insists that when the State impeached Dr. Ofshe with Clark's statement, Calloway's rights under the Confrontation Clause were violated. We review challenges based on the Confrontation Clause de novo. See McWatters v.

State, 36 So. 3d 613, 637 (Fla. 2010). The Confrontation Clause does not permit the admission of a confession of a nontestifying codefendant to be used substantively against the defendant. Bruton v. United States, 391 U.S. 123, 136-37 (1968). Both this Court and the United States Supreme Court have explained that statements of a codefendant should be viewed with particular skepticism, given the motivation to implicate another person. Ramirez v. State, 739 So. 2d 568, 579 (Fla. 1999) (citing Lee v. Illinois, 476 U.S. 530, 541 (1986); Farina v. State, 679 So. 2d 1151, 1155 (Fla. 1996)). In Ramirez, we concluded that it was reversible error to admit extensive details from a codefendant's statement that incriminated Ramirez. 739 So. 2d at 579-81. Although Ramirez opened the door to limited questions regarding whether there was evidence that contradicted his testimony, the door was not so widely opened as to permit the details of the codefendant's confession. Id. at 580-81 (citing Pacheco v. State, 698 So. 2d 593, 595-96 (Fla. 2d DCA 1997)).

However, it is equally clear that a codefendant's incriminating statements that are admitted for nonhearsay purposes, such as impeachment, do not invoke the protections of the Confrontation Clause. E.g., Tennessee v. Street, 471 U.S. 409, 414 (1985); McWatters, 36 So. 3d at 637-38 ("The Confrontation Clause 'does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted.' " (quoting Crawford v. Washington, 541 U.S. 36, 60 n.9

(2004))); see also Kansas v. Ventris, 556 U.S. 586, 594 (2009) (holding that a statement obtained in violation of the Sixth Amendment could nonetheless be used for impeachment purposes).

In this case, limited information from Clark's confession that incriminated Calloway was used to impeach Dr. Ofshe. Dr. Ofshe presented a theory on direct examination that Calloway could have learned many of the details provided in his confession from alternate sources, such as media reports or the interrogating officers, which would make his confession less reliable. To discredit Dr. Ofshe's theory, the State asked Dr. Ofshe whether he was aware that Clark had provided a similar account two days before Calloway was arrested. When Dr. Ofshe admitted that he was aware of these statements, the State then asked Dr. Ofshe about his earlier statement to Calloway that pointed out the apparent contradiction, and when pressed, Dr. Ofshe equivocated. At one point, Dr. Ofshe stated that there could be other reasons for the apparent contradiction, such as memory error; however, he later admitted that if Calloway had indeed lied to him, Dr. Ofshe would have to reevaluate his assessment of Calloway and Calloway's confession.

Moreover, unlike in Bruton, Ramirez, or Pacheco, Clark's full confession was not admitted during trial to prove Calloway's guilt. Instead, the State used two specific details from Clark's confession to conduct a narrow cross-examination of Dr. Ofshe to question his assessment of Calloway's veracity, and

ultimately, Dr. Ofshe's credibility. This use of Clark's incriminating statements did not violate the Confrontation Clause. Street, 471 U.S. at 414; McWatters, 36 So. 3d at 637-38.

Bolstering of Witnesses for the State

Next, Calloway claims that the State improperly bolstered the credibility of Detective Everett, one of the detectives who elicited the confession, and Fabrice Nelson, the lead crime scene technician. During the cross-examination of Sergeant Eunice Cooper, defense counsel asked her about a policy of the City of Miami Police Department, which required felony suspects to be handcuffed during transport. On redirect, Cooper explained that the policy allowed for officer discretion:

> Prosecutor: Was Sergeant Willie Everette [sic] at that time a capable police detective?
>
> Defense counsel: Objection. Calls for an opinion.
>
> Prosecutor: As a supervisor, your Honor.
>
> The Court: Overruled.
>
> Defense counsel: Character evidence of the witness. Bolstering.
>
> The Court: Overruled. It's something that is of her knowledge.
>
> Sergeant Cooper: Yes. Sergeant Everette [sic] was a capable supervisor and Sergeant Everette [sic] used his discretion.
>
> Prosecutor: What about physically, Sergeant Cooper. Was [he] a physical capable adult male?

- 55 -

Sergeant Cooper: Yes.

Prosecutor: Was he a confident police officer?

Defense counsel: Objection. Relevance.

The Court: Sustained.

Calloway also alleges that the State improperly bolstered the testimony of Nelson through the cross-examination of Rupert Butcher, a fingerprint expert who was called by the defense. Nelson was the lead crime scene investigator in 1997 and testified about the forensic evidence collected from the apartment during the State's case-in-chief. At the time of trial, Butcher was a senior latent fingerprint examiner for the City of Miami Police Department, but he was not employed by the city in 1997 and was not involved in the investigation until 2003. He testified on direct examination that the manner in which duct tape was collected and commingled was not a standard collection procedure. During cross-examination, the State elicited testimony from Butcher that because he was not involved in the investigation until at least 2003, he had no way of knowing whether Nelson acted improperly. After the State confirmed with Butcher—without objection—that there was no reason to suggest that Nelson improperly preserved evidence or "did a sloppy job" in 1997, the following exchange occurred:

> Prosecutor: Didn't Fabrice Nelson do an excellent job of collecting [and] preserving evidence from this scene as we can see it in State's Exhibit 28.

Defense counsel:  Objection.  He has no way of knowing.  He was not there.  Calls for improper opinion.

The Court:  You can answer, sir if you know.

Butcher:  Again, well I wasn't there to know exactly but based on the gravity or amount of evidence that he actually collected and processed, I would say that he did a very good job of processing the evidence.

During redirect examination, defense counsel also elicited from Butcher that Nelson "did a very good job" preserving and documenting the evidence at the crime scene.

Generally, this Court will not reverse a decision regarding the admissibility of evidence absent an abuse of discretion by the trial court.  E.g., Hall v. State, 107 So. 3d 262, 273 (Fla. 2012) (citing Ray v. State, 755 So. 2d 604, 610 (Fla. 2000)). However, it is erroneous to permit a witness to comment on the credibility of another witness because the jury alone determines the credibility of witnesses. Tumblin v. State, 29 So. 3d 1093, 1101-02 (Fla. 2010); Knowles v. State, 632 So. 2d 62, 65-66 (Fla. 1993); Page v. State, 733 So. 2d 1079, 1080-81 (Fla. 4th DCA 1999) (citing Barnes v. State, 93 So. 2d 863 (Fla. 1957)).  Testimony from a police officer about the credibility of another witness may be particularly harmful because a jury may grant greater credibility to the officer.  Tumblin, 29 So. 3d at 1101-02 ("Police officers, by virtue of their positions, rightfully bring with their testimony an air of authority and legitimacy.  A jury is inclined to give great weight to their

opinions." (citations and ellipses omitted)); Seibert v. State, 923 So. 2d 460, 472 (Fla. 2006). Improper bolstering is reviewed for harmless error. See Johnson v. State, 969 So. 2d 938, 955 (Fla. 2007); Knowles, 632 So. 2d at 66.

Improper bolstering can result in harmful error when the credibility of the bolstered witness is of critical importance to the State. The Fourth District Court of Appeal in Page concluded that the State allowed a police witness to improperly bolster the credibility of a confidential informant. 733 So. 2d at 1080-81. The officer testified that the informant, who was the only witness to the alleged drug transaction, had previously provided "very trustworthy and reliable" information. Id. at 1081. The Fourth District concluded that this erroneous statement was reversible partially because the main goal of the defense was to question the credibility of that informant. Id. at 1080-81; see also Tumblin, 29 So. 3d at 1101-03 (finding an abuse of discretion to permit bolstering by a key witness).

However, in this case, Cooper's testimony did not constitute improper bolstering of Everett. Cooper was not asked whether any particular statements by Everett during his videotaped testimony were incorrect, unreliable, or otherwise untrustworthy. Instead, her testimony explained the department's handcuff policy, which was a matter of officer discretion. The jury viewed videotaped testimony of Everett, who was then undergoing treatment for cancer and passed away by the time of trial. The question from the prosecutor and answer from Cooper merely

- 58 -

informed the jury that during Calloway's interrogation and transport in the van, Everett could have handcuffed Calloway if he felt it was appropriate, but chose not to do so. This did not amount to improper bolstering of Everett's credibility.

Even if we were to conclude that this constituted bolstering, any error in Cooper's testimony would be harmless. Cooper, who testified for a single day in a trial that lasted more than two months, provided a single statement that Everett was capable and used his discretion regarding the handcuff policy. Although there is a general concern that one officer complimenting the professional work of another may improperly influence the jury, see Tumblin, 29 So. 3d at 1101-02, the handcuff policy only tangentially related to the main issue of the trial—whether Calloway's confession was forced or coerced. It was undisputed that Calloway was not handcuffed during his interrogation or the van ride. Thus, whether Everett was capable or used his discretion with regard to the handcuff policy was irrelevant to the question of whether Calloway's confession, which occurred before the handcuff issue during the van ride, was forced or coerced. Unlike the disputed testimony in Page or Tumblin, the State's case against Calloway did not hinge on Everett's credibility regarding the use of handcuffs. Therefore, we conclude that there is no reasonable possibility that any error in Cooper's testimony could have affected the verdict. See DiGuilio, 491 So. 2d at 1135.

Moreover, Butcher's testimony did not constitute bolstering. Defense counsel sought to undermine the credibility of the forensic investigation conducted by Fabrice Nelson through the testimony of Butcher. Defense counsel did not object to several questions regarding the quality of Nelson's work before the aforementioned exchange, nor did defense counsel object to later comments about the quality of Nelson's work. Indeed, during redirect questioning <u>by defense counsel</u>, Butcher repeated that Nelson "did a very good job" in the 1997 investigation. Rather than constitute improper bolstering, this exchange was the product of an unsuccessful attempt to attack the forensic work of Nelson. Defense counsel opened the door to cross-examination regarding Butcher's opinion of Nelson's conduct, and the State sought to rehabilitate Nelson's competency. We conclude that the trial court did not abuse its discretion when it allowed this testimony.

Burden Shifting in Guilt Phase Closing Statements

The next issue raised is whether the State impermissibly shifted the burden of proof to Calloway during its guilt phase closing statements. The State began its guilt phase rebuttal argument with the following statement:

> We know exactly what this case comes down to. We have known this all along. Absolutely nothing. Nothing, nothing has changed. We are still here with the situation of do you believe all the evidence in this case of the officers and civilians alike each of them which supports the other[,] or do you believe his story?

Calloway objected, claiming misstatement of the evidence, which the court overruled; the court instructed the jury to rely on its own recollection of the evidence.[16]

Although parties enjoy wide latitude during closing statements, they may not resort to improper argument. E.g., Merck v. State, 975 So. 2d 1054, 1061 (Fla. 2007) (citing Gore v. State, 719 So. 2d 1197, 1200 (Fla. 1998)). Attorneys must raise contemporaneous objections to preserve the claim for appellate review. Id.

> [W]e consistently have stated that proper preservation entails three components. First, a litigant must make a timely, contemporaneous objection. Second, the party must state a legal ground for that objection. Third, in order for an argument to be cognizable on appeal, it must be the specific contention asserted as legal ground for the objection . . . below.

Harrell v. State, 894 So. 2d 935, 940 (Fla. 2005) (internal quotation marks and citations omitted) (some emphasis supplied).

Unpreserved errors made in closing statements are reviewed for fundamental error. Merck, 975 So. 2d at 1061. An error so fundamental as to require reversal "must reach down into the validity of the trial itself to the extent that a verdict of guilty could not have been obtained without the assistance of the alleged error."

---

16. Defense counsel raised two burden-shifting objections to statements later in the rebuttal closing statement that were overruled, but Calloway challenges only the statement quoted above in his appeal.

Brown v. State, 124 So. 2d 481, 484 (Fla. 1960). Fundamental error must amount to a denial of due process, and consequently, should be found to apply where prejudice follows. J.B. v. State, 705 So. 2d 1376, 1378 (Fla. 1998); see also F.B. v. State, 852 So. 2d 226, 229 (Fla. 2003).

During trial, defense counsel objected to the statement, but only objected on the grounds of misstatement of the evidence. Therefore, Calloway did not preserve this issue and we review it for fundamental error. See Merck, 975 So. 2d at 1061; Harrell, 894 So. 2d at 940.

We conclude that no fundamental error occurred during the State's closing statement. This remark is the only statement that Calloway alleges shifted the burden from the State to prove Calloway's guilt beyond a reasonable doubt. The State's closing statement, which included both an initial and rebuttal statement, continued for more than a day. During this time, the State extensively reviewed all of the evidence placed before the jury during the two-month long trial. Cf. Merck, 975 So. 2d at 1061 (noting that a single improper argument did not mandate reversal). Even when viewed cumulatively with the burden-shifting objections Calloway subsequently raised, which he does not now challenge, this error was not to the level as to fundamentally deny Calloway the right to due process. See J.B., 705 So. 2d at 1378. We therefore deny this claim.

<u>Substitute Medical Examiner</u>

- 62 -

Calloway also claims that the State violated Calloway's rights under the Confrontation Clause when it allowed a substitute medical examiner to testify. In support of this claim, Calloway relies upon the decision of the United States Supreme Court in Melendez-Diaz v. Massachusetts, 557 U.S. 305, 310-11 (2009), which concluded that forensic analysts who provide testimonial evidence must be subject to confrontation by the defendant.

The trial court allowed Dr. Hyma to testify in place of Dr. Siebert with regard to the causes of death and injuries to the victims. Dr. Siebert was the medical examiner who performed the autopsies, but moved to North Florida by the time of trial. In a 2007 discovery deposition, Dr. Siebert claimed that the reason for his relocation was that then-Attorney General Charlie Crist had filed complaints against Dr. Siebert, which led to an audit of his records and a temporary lapse in his medical license. Dr. Siebert alleged that this investigation was politically motivated and a retaliation against him for a controversial decision he had made in an unrelated autopsy several years after these homicides, but he was never formally disciplined.

Before and during trial, defense counsel objected that the State had failed to demonstrate that Dr. Siebert was unavailable, in violation of Crawford.[17] Without

17. The State suggested that Dr. Siebert was unavailable because he was in North Florida at the time: "Dr. Siebert no longer works in this jurisdiction and we made a choice not to bring an expert from a remote location back to this

expressly concluding that Dr. Siebert was unavailable, the trial court ruled that Dr. Hyma could offer his own opinion and be subject to cross-examination during trial. Dr. Hyma testified that he reviewed photographs and a descriptive narrative taken from the crime scene; body diagrams and sketches; police records; medical records; and Dr. Siebert's autopsy reports to prepare his opinion regarding the causes of death. He testified that Dr. Siebert was part of the investigative team that responded to the crime scene in 1997, and a homicide officer likely attended the autopsies conducted by Dr. Siebert. During redirect, Dr. Hyma confirmed that he developed his own objective findings regarding the causes of death and stated that he primarily relied on photographs taken from the scene. At the conclusion of his testimony, the court read to the jury that the parties stipulated to the legal identity of the victims.

When there is a Confrontation Clause challenge to an evidentiary ruling of a trial court, we conduct a de novo review. See McWatters, 36 So. 3d at 637. Crawford violations are reviewed for harmless error. Barnes v. State, 29 So. 3d 1010, 1027-28 (Fla. 2010) (citing Rodgers v. State, 948 So. 2d 655, 665 (Fla. 2006)); see also Bullcoming v. New Mexico, 564 U.S. 647, 668 n.11 (2011)

---

jurisdiction to testify in this trial." However, the State was willing to transport Anthony Strachan from Arizona and Dr. Richard Welner from New York to Florida during the guilt phase.

(suggesting that a harmless error analysis could apply to violations of the Confrontation Clause (citing Melendez-Diaz, 557 U.S. at 329 n.14)).

Florida law historically permitted a substitute medical examiner to testify in the place of the medical examiner who performed the autopsy. See, e.g., Schoenwetter v. State, 931 So. 2d 857, 870-71 (Fla. 2006) (citing Geralds v. State, 674 So. 2d 96 (Fla. 1996)); Capehart v. State, 583 So. 2d 1009, 1012-13 (Fla. 1991) (permitting a substitute medical examiner to testify as an expert about facts or data that were not admitted into evidence); Ramirez v. State, 542 So. 2d 352, 355 (Fla. 1989). However, the United States Supreme Court in Crawford explained that the Sixth Amendment requires the declarant of a testimonial hearsay statement in a criminal case to testify at trial, unless the witness is unavailable and the defendant is afforded a prior opportunity to cross-examine the witness. 541 U.S. at 68.[18]

In State v. Belvin, 986 So. 2d 516 (Fla. 2008), this Court reviewed the admissibility of forensic reports in light of Crawford. The Court concluded that the reports were testimonial, and their admission violated Crawford because the right to confront the witness during a discovery deposition was not a sufficient substitute for the right to confront a witness in court. 986 So. 2d at 524-25 (citing

---

18. We did not consider the impact of Crawford in Schoenwetter because the defendant failed to preserve the issue. See 931 So. 2d at 871.

State v. Lopez, 974 So. 2d 340, 349-50 (Fla. 2008); Blanton v. State, 978 So. 2d 149, 155 (Fla. 2008)).

In 2009, the Supreme Court concluded in Melendez-Diaz that affidavits prepared by forensic technicians were testimonial under Crawford. Therefore, the defendant had the right under the Confrontation Clause to confront the analysts who prepared the affidavits, absent (1) a finding that the analysts were unavailable, and (2) the defendant's having had a prior opportunity to cross-examine them. 557 U.S. at 311.

This Court subsequently distinguished both Belvin and Melendez-Diaz and approved of the testimony of a supervising witness who offered her own opinion based on data generated by a team of analysts. Smith v. State, 28 So. 3d 838, 853-55, 855 n.12 (Fla. 2009). The trial court in that case permitted an FBI team supervisor to testify about her conclusion that a DNA sample matched the known profile of the defendant. Id. at 853. This Court explained that unlike the experts in Belvin or Melendez-Diaz, the expert in Smith drew her own conclusions from the raw data generated by several members of her team and—more importantly— testified during trial, where she was subject to cross-examination as to those conclusions. 28 So. 3d at 854-55. Therefore, her testimony did not violate the Confrontation Clause. Id.

Following Melendez-Diaz, the United States Supreme Court further elaborated on the admissibility of forensic laboratory reports in Bullcoming, 564 U.S. 647, and Williams v. Illinois, 132 S. Ct. 2221 (2012). In Bullcoming, a majority of the Court held that a surrogate testifying witness could not be used to admit a forensic report written by a nontestifying technician. 564 U.S. at 663. In that case, the original analyst who had performed a blood alcohol content test was unexpectedly placed on unpaid leave on the eve of trial, but the prosecution did not claim that the analyst was unavailable. Id. at 661-62. In criticizing the use of testimony from a surrogate witness who did not offer an independent opinion, defense counsel was denied the opportunity to question the original analyst about the procedures used, or explore why the analyst had been placed on unpaid leave. Id. The Court concluded that testimony from the surrogate witness did not cure the underlying violation of Bullcoming's right under the Sixth Amendment to confront the original analyst. Id. at 663.

In a concurring opinion, Justice Sotomayor emphasized the narrow scope of Bullcoming:

> [T]his is not a case in which the person testifying is a supervisor, reviewer, or someone else with a personal, albeit limited, connection to the scientific test at issue. . . . It would be a different case if, for example, a supervisor who observed an analyst conducting a test testified about the results or a report about such results. . . .
> . . . [T]his is not a case in which an expert witness was asked for his independent opinion about underlying testimonial reports that were not themselves admitted in evidence. See Fed. Rule Evid. 703

(explaining that facts or data of a type upon which experts in the field would reasonably rely in forming an opinion need not be admissible in order for the expert's opinion based on the facts and data to be admitted). . . . We would face a different question if asked to determine the constitutionality of allowing an expert witness to discuss others' testimonial statements if the testimonial statements were not themselves admitted as evidence.

> . . . .

This case does not present, and thus the Court's opinion does not address, any of these factual scenarios.

Id. at 672 (Sotomayor, J., concurring in part). Four Justices dissented on the basis that they concluded that the evidence was not testimonial under the Confrontation Clause. Id. at 674-84 (Kennedy, J., dissenting).

In Williams, a plurality of the Supreme Court concluded that an expert witness could offer an opinion about a forensic report without ultimately testifying to the underlying truth of that report. 132 S. Ct. at 2227-28. The report itself was prepared by a nontestifying witness, but was not admitted. Id. The plurality, written by Justice Alito and joined by Chief Justice Roberts and Justices Kennedy and Breyer, further held that the report itself would not have violated the Confrontation Clause, even if it had been admitted. Id. at 2242. The plurality concluded that the report was not testimonial because it was generated at a time when a dangerous, unknown rapist was at large. Id. at 2243-44 (citing Michigan v.

- 68 -

Bryant, 562 U.S. 344, 359-62 (2011)).[19] Justice Thomas concurred in the judgment on the basis that the evidence was admissible "solely because [the report] lacked the requisite 'formality and solemnity' to be considered 'testimonial' for the purposes of the Confrontation Clause." Id. at 2255 (Thomas, J., concurring in the judgment) (citing Bryant, 562 U.S. at 361).

With the exception of Smith, this Court has not considered whether a substitute forensic technician, specifically a medical examiner, may testify in the wake of Melendez-Diaz, Bullcoming, and Williams. Despite the lack of a clear majority opinion in Williams, the factual similarities between this case and Williams, as well as our decision in Smith, lead us to conclude that the surrogate testimony of Dr. Hyma did not violate Calloway's rights under the Confrontation Clause. First, Dr. Hyma was available during trial to testify and was subject to cross-examination. See Smith, 28 So. 3d at 853-55, 855 n.12. Second, unlike in Bullcoming, the autopsy reports of Dr. Siebert were not admitted through the testimony of Dr. Hyma. See Williams, 132 S. Ct. at 2238-40 (plurality opinion) (finding no Confrontation Clause violation in the admission of an expert opinion that relies upon data not directly in evidence); Bullcoming, 564 U.S. at 668

---

19. In Bryant, the Court explained that statements made to an officer in the course of an active police investigation were not testimonial and therefore not subject to the Confrontation Clause because the primary purpose of such statements was to assist the police in that investigation. 562 U.S. at 359-62.

(Sotomayor, J., concurring in part). Instead, Dr. Hyma clearly explained to the jury that his independent opinion was derived from the photographs taken by investigators at the scene and from Dr. Siebert's autopsy reports. It was this independent opinion that was available during trial and subject to cross-examination. See Smith, 28 So. 3d at 853-55. Although the expert in Smith supervised several analysts, both the expert in Smith and Dr. Hyma testified that they drew their own independent conclusions. See id. Therefore, Calloway was afforded the in-court opportunity to cross-examine the State's expert about the causes of death, and no violation of the Confrontation Clause occurred.

Even if we were to conclude that an error occurred, it would be harmless. The sole purpose of producing Dr. Siebert in this case would be to impugn his credibility by asking about the 2006 audit of his records, which Dr. Siebert claimed had been politically motivated and baseless. During his discovery deposition, Dr. Siebert claimed that many of the errors he had supposedly committed were typos and did not undermine his medical findings; however, defense counsel pointed to at least one instance in which he allegedly mistook the gender of a cadaver. Regardless of such disputes, in this case, the causes of death were not challenged, and the parties stipulated to the legal identity of the victims.[20] Furthermore, Dr.

_____

20. Additionally, had Dr. Siebert testified, it may have resulted in a collateral discussion as to whether he actually committed significant errors throughout his career. The ultimate result of the audit was unclear: Dr. Siebert

Hyma's testimony was a relatively short component of a lengthy guilt phase of a

trial that spanned more than two months. We conclude that any error in allowing

Dr. Hyma to testify in Dr. Siebert's place had no reasonable possibility of affecting

the verdict and was therefore harmless. See Barnes, 29 So. 3d at 1027-28;

DiGuilio, 491 So. 2d at 1135.

Limitations on Penalty Phase Closing Statement

The next issue that Calloway challenges is the limitation imposed on defense

counsel during the closing statement of the penalty phase. The only new evidence

that the State presented during the penalty phase consisted of victim impact

testimony; the State presented no further evidence of aggravating circumstances

beyond Calloway's conviction. During closing statements of the penalty phase, the

following exchange occurred:

> Defense Counsel: . . . We're here now to discuss the aggravators. We are here to discuss how the aggravators were proven to and we are here to discuss have you really heard sufficient reliable evidence beyond a reasonable doubt that these aggravators have occurred . . . . One of the aggravators is that the crime was cold, calculated[,] and premeditated. . . . Let's look at what was presented to prove it was cold, calculated[,] and premeditated.
>
> Well, we are told that it went on over a period of time. We are told that someone left and got tape and came back, we're told all of

---

claimed that he was never formally disciplined, but admitted that he was removed from his professional position. See Williams, 132 S. Ct. at 2236 (plurality opinion) (expressing concern about potential juror confusion).

these facts but other than what Mr. Calloway said in that statement there is no corroborating evidence—

State:  Objection.

The Court:  Sustained.

Defense Counsel:  —to prove the aggravators.

The Court:  The jury is to rely on the recollection of the evidence presented.

Defense Counsel:  Well, as you rely on it, as you rely on what you heard, you will recall that there was nothing to corroborate—

State:  Objection.

The Court:  Sustained.

In a subsequent sidebar conference, defense counsel claimed that there was no evidence to corroborate certain details in Calloway's confession, such as the length of time the victims were held captive and duct-taped by Calloway and Clark.  The trial court disagreed with that assessment of the evidence in record, sustained objections from the State, and instructed the jury to rely on its recollection of the evidence.

Before this Court, the parties dispute whether this limitation was proper. Calloway asserted that the trial court improperly curtailed statements by defense counsel that challenged whether the State had proven the HAC and CCP aggravating circumstances beyond a reasonable doubt.  The State claimed instead that the trial court properly prevented defense counsel from relitigating the guilt

phase because defense counsel sought to establish a lack of evidence that corroborated Calloway's confession.

Parties are afforded wide latitude during their closing statements, subject to the discretion of the trial court. See, e.g., Pham v. State, 70 So. 3d 485, 492 (Fla. 2011). During the penalty phase, the State is required to establish aggravating circumstances beyond a reasonable doubt. Gonzalez v. State, 990 So. 2d 1017, 1029 (Fla. 2008). Although defendants are permitted to challenge evidence of aggravating circumstances presented by the State, they cannot do so in a way that relitigates the underlying determination of guilt by the jury. Duest v. State, 855 So. 2d 33, 40 (Fla. 2003) (citing Way v. State, 760 So. 2d 903, 916 (Fla. 2000); Waterhouse v. State, 596 So. 2d 1008, 1015 (Fla. 1992)). A defendant may not introduce evidence of residual doubt either to challenge a presented aggravating circumstance or establish a nonstatutory mitigating circumstance. E.g., Reynolds v. State, 934 So. 2d 1128, 1152 (Fla. 2006) (noting that this Court has long rejected the use of lingering doubt as a nonstatutory mitigating factor); Duest, 855 So. 2d at 40 (barring the use of a residual doubt argument to challenge an aggravating circumstance); see also Oregon v. Guzek, 546 U.S. 517, 526-27 (2006) (refusing to recognize a constitutional right to consider residual doubt as mitigation evidence).

In England v. State, 940 So. 2d 389, 404-05 (Fla. 2006), the defendant sought to testify on his behalf during the penalty phase. The trial court excluded

this testimony after it concluded that the testimony would relitigate the matter of his guilt, rather than present relevant, mitigating evidence. Id. We concluded that this was not an abuse of discretion. Id.

Here, Calloway asserts that defense counsel did not attempt to relitigate his guilt during penalty phase closing statements; rather, defense counsel sought to challenge whether the State had proven the HAC and CCP aggravating circumstances beyond a reasonable doubt. However, defense counsel presented no specific precedent either during trial or before this Court to support his claim that he could challenge the HAC and CCP aggravating circumstances by questioning the reliability of Calloway's confession presented during the guilt phase in the closing statements of the penalty phase. This proposed argument was not only an inaccurate description of the evidence in record, as noted by the trial court, but it also sought to undermine an issue determined in the guilt phase, the validity of Calloway's confession. The trial court did not prevent defense counsel from making proper arguments before the jury. Therefore, we conclude that the trial court acted within its discretion to prevent this improper argument. England, 940 So. 2d at 404-05; Duest, 855 So. 2d at 40.

### Exclusion of Medical Records of Calloway's Father

Next, Calloway submits that the trial court improperly excluded the medical records of his father, Solomon Calloway, as mitigation. When Calloway was five

or six years old, his mother took him and his brother Reginald to live in Miami, and his father remained in Georgia. Solomon was diagnosed with schizophrenia and post-traumatic stress disorder (PTSD) in 2002, while Calloway was in custody and awaiting this trial. The day before the penalty phase commenced, defense counsel presented the State with voluminous evidence of Solomon's medical records. Defense counsel hoped to discuss Solomon's diagnoses to explain his bizarre behavior towards, and ultimate abandonment of, Calloway. The trial court allowed defense counsel to present evidence of Solomon's violence towards Calloway and his mother, and his abandonment of his children, but excluded Solomon's medical records as irrelevant. Calloway argues before this Court that this exclusion improperly limited his presentation of mitigation evidence.

In Lockett v. Ohio, 438 U.S. 586, 604-05 (1978), the Supreme Court concluded that a defendant must be permitted to present any mitigating evidence that concerns "any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." More recently, the Court rejected a test that required proposed mitigating evidence to have some "nexus" to the underlying crime to be relevant and therefore admissible. Tennard v. Dretke, 542 U.S. 274, 283-88 (2004). Instead, the Court explained that there was no unique definition of relevancy applicable to capital sentencing:

When we addressed directly the relevance standard applicable to mitigating evidence in capital cases in McCoy v. North Carolina, 494 U.S. 433, 440-441, (1990), we spoke in the most expansive terms. We established that the meaning of relevance is no different in the context of mitigating evidence introduced in a capital sentencing proceeding than in any other context, and thus the general evidentiary standard—any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence—applies. . . . We quoted approvingly from a dissenting opinion in the state court: "Relevant mitigating evidence is evidence which tends logically to prove or disprove some fact or circumstance which a fact-finder could reasonably deem to have mitigating value." Thus, a State cannot bar the consideration of evidence if the sentencer could reasonably find that it warrants a sentence less than death.

Once this low threshold for relevance is met, the Eighth Amendment requires that the jury be able to consider and give effect to a capital defendant's mitigating evidence.

Id. at 284-85 (some citations omitted).

We have reiterated the role that relevance plays in the admission of potentially mitigating evidence. Farina v. State, 937 So. 2d 612, 619 (Fla. 2006) ("As with all evidence, however, mitigating evidence must meet a threshold of relevance."). Similarly, in Hill v. State, 515 So. 2d 176, 177-78 (Fla. 1987), this Court found no abuse of discretion by a trial court's exclusion of mitigating evidence that concerned the character of the defendant's family members, rather than the character of the defendant himself:

The record reflects that five persons, including Hill's mother and father, testified as character witnesses for the defense. The judge refused to permit appellant's mother to testify that she cared for appellant's cousins, as well as her own children. Similarly, the judge declined to allow defense counsel to question appellant's father

regarding his own ill health and past job responsibilities. <u>In our view, the excluded evidence focused substantially more on the witness's character than on appellant's.</u> There has been no showing that the trial court abused his discretion in excluding the testimony . . . .

<u>Id.</u> (emphasis supplied) (citing <u>Hitchcock v. Dugger</u>, 481 U.S. 393 (1987); <u>Eddings v. Oklahoma</u>, 455 U.S. 104 (1982); <u>Lockett</u>, 438 U.S. 586); <u>see also</u> <u>Hess v. State</u>, 794 So. 2d 1249, 1269 (Fla. 2001) ("What <u>Lockett</u> does require is the admission of evidence that establishes facts relevant to the defendant's character, his prior record, and the circumstances of the offense in issue.").

Although the trial court did not allow defense counsel to present evidence of Solomon's medical diagnoses, defense counsel were permitted to elicit vivid, undisputed[21] testimony about the abuse Calloway and his mother suffered at the hands of Solomon, including that (1) Solomon attempted to drown Shirley in a bathtub when Calloway was an infant; (2) Solomon regularly visited the trailer that Shirley lived in with Calloway and beat both of them with a switch; and (3) once when Calloway was a toddler, he handed his mother a bat to defend herself against Solomon. After Shirley relocated her children to Miami, Calloway had little contact with his father.

---

21. Although Calloway suggests that Shirley's history of drug abuse and neglect may have diminished her credibility before the jury, the State minimally challenged her testimony with limited cross-examination.

The trial court drew the line at the introduction of evidence of Solomon's medical diagnoses, which were not made until 2002, several years after Calloway was arrested in 1998 and long after he lost contact with his father in the 1980s. Furthermore, during trial, defense counsel only provided Solomon's medical records to the State on the eve of opening statements for the penalty phase. In its ruling to exclude the records, the court noted that the State had been denied a fair opportunity to review the evidence and prepare a rebuttal. Defense counsel also admitted that they could not prove that Solomon's violent behavior in the 1980s resulted from either diagnosis. Additionally, Calloway did not present any evidence during the penalty phase that suggested that he suffered from mental health issues himself. Calloway only presented Dr. Toomer during the Spencer hearing, who testified that Calloway's background likely diminished his cognitive processing, but ultimately offered no medical diagnosis for Calloway.

We conclude that Solomon's medical diagnoses were not relevant to Calloway's background. The fact that Solomon was diagnosed with schizophrenia and PTSD decades after abusing Calloway and Shirley does not make the uncontroverted fact that Calloway both witnessed and suffered abuse from Solomon more or less probable. See § 90.401, Fla. Stat. (1997) ("Relevant evidence is evidence tending to prove or disprove a material fact."). The jury heard unchallenged evidence regarding Solomon's abusive behavior, which is a

mitigating factor in Calloway's background. See Lockett, 438 U.S. at 604-05. However, the ultimate cause of that behavior pertained to the character of Solomon, not Calloway. See Hill, 515 So. 2d at 177-78. Therefore, Solomon's medical records were not relevant mitigating evidence of Calloway's background, and the trial court did not abuse its discretion to exclude them.

### Sufficiency

Although Calloway does not raise the issue, this Court has an independent obligation to review the record for competent, substantial evidence that supports the defendant's convictions. E.g., Brown v. State, 143 So. 3d 392, 407 (Fla. 2014) (citing Blake v. State, 972 So. 2d 839, 850 (Fla. 2007); Fla. R. App. P. 9.142(a)(5)). If a rational trier of fact may conclude, upon a review of the evidence in the light most favorable to the State, that the elements of the crime have been proven beyond a reasonable doubt, we will affirm the convictions. Id.

Calloway's confession constitutes direct evidence of guilt under Florida law. Simmons v. State, 934 So. 2d 1100, 1111 (Fla. 2006). Although his testimony challenged that confession, it is the duty of the jury, not this Court, to weigh conflicting evidence. See Hertz v. State, 803 So. 2d 629, 646 (Fla. 2001). Calloway admitted that he purchased clothing and planned the robbery with Campbell several days before the crimes occurred. After he and Clark subdued, gagged, and blindfolded Melvin, Copeland, Thomas, McGuire, and St. Charles

with duct tape, he and Clark debated for some period of time about which men to kill. Calloway sent Clark to speak to Campbell for advice, and when Clark informed him that Campbell said they only needed to kill two men, Calloway replied that if only two were killed, the remaining men would identify them. Clark returned to Campbell, who approved of killing all of the men, and before executing them, Calloway increased the volume of the stereo to muffle the sound of gunshots.

Additionally, Calloway confessed that he accosted St. Charles in the parking lot, placed St. Charles in a chokehold, and gained entry to St. Charles's apartment with a .45 caliber gun pointed at St. Charles. He further stated that he and Clark took marijuana, jewelry, phones, beepers, and cash from the victims before they exited the apartment. Anthony Strachan also testified that he saw St. Charles downstairs in the parking lot with two unidentified black men, one of whom he later saw exit St. Charles's apartment with a small box that belonged to St. Charles. Latonya Taylor stated that Melvin frequently wore a gold and diamond bracelet that she never saw after his death. Adolphus Thornton testified that he helped Calloway pawn a distinctive gold bracelet that he recognized as Melvin's a few days after the murders. Calloway's confession, coupled with corroborating testimony from Strachan, Taylor, and Thornton, supplied competent, substantial evidence of the first-degree murders of Melvin, Thomas, Copeland, St. Charles,

and McGuire, as well as for the convictions for armed robbery, armed kidnapping, and armed burglary.

## Hurst v. Florida

Finally, Calloway asserts that Florida's death penalty sentencing scheme, which allows a non-unanimous jury to recommend the death penalty, violates the Sixth and Fourteenth Amendments under Apprendi v. New Jersey, 530 U.S. 466 (2000), and Ring v. Arizona, 536 U.S. 584 (2002). During the pendency of this appeal, the United States Supreme Court issued its decision in Hurst v. Florida, in which it held that Florida's capital sentencing scheme violated the Sixth Amendment. See 136 S. Ct. 616, 621 (2016). The Supreme Court concluded that "[t]he Sixth Amendment requires a jury, not a judge, to find each fact necessary to impose a sentence of death. A jury's mere recommendation is not enough." Id. at 619. On remand from the Supreme Court, we held that "before a sentence of death may be considered by the trial court in Florida, the jury must find the existence of the aggravating factors proven beyond a reasonable doubt, that the aggravating factors are sufficient to impose death, and that the aggravating factors outweigh the mitigating circumstances." Hurst v. State (Hurst v. State), 202 So. 3d 40, 53 (Fla. 2016). We further held that a unanimous jury recommendation is required before a trial court may impose a sentence of death. See id. Finally, we determined that a Hurst error is capable of harmless error review. See id. at 67.

New rules of law announced by this Court or the United States Supreme Court will apply to all cases that are pending on direct review or are otherwise not finalized. State v. Johnson, 122 So. 3d 856, 861 (Fla. 2013) (citing Griffith v. Kentucky, 479 U.S. 314, 328 (1986); Smith v. State, 598 So. 2d 1063, 1066 (Fla. 1992)). This case is before us on direct appeal; therefore, Calloway's appeal is subject to Hurst v. Florida and Hurst v. State.

For the reasons expressed in Hurst v. State, Calloway is entitled to a new penalty phase. The jury in this case made no factual findings regarding the aggravation, mitigation, or relative weight of either before it recommended that Calloway be sentenced to death for each victim by a vote of seven to five. His sentences, therefore, are contrary to the Sixth Amendment as interpreted Hurst v. Florida and Hurst v. State. Further, we cannot conclude that this error was harmless beyond a reasonable doubt in light of the nonunanimous jury recommendation. Compare Hurst v. State, 202 So. 3d at 53-55 (concluding that a new penalty phase was required following a seven-to-five jury recommendation of a death sentence) with King v. State, SC14-1949, slip op. at 41-48 (Fla. Jan. 26, 2017) (noting that any Hurst v. Florida sentencing error was harmless beyond a reasonable doubt in part because the jury unanimously recommended a death sentence). As in Hurst v. State, "We decline to speculate as to why seven jurors in this case recommended death and why five jurors were persuaded that death was

not the appropriate penalty." 202 So. 3d at 69.  Therefore, we must remand this matter for new penalty phase.  See id.

**CONCLUSION**

With regard to the State's cross-appeal, we conclude that the trial court erred when it failed to conduct a Frye hearing before Dr. Ofshe was permitted to testify, but this error was harmless.  We also reject Calloway's guilt phase claims and conclude that sufficient evidence supported his convictions.  We further conclude that, with the exception of the Hurst v. Florida claim, Calloway's penalty phase claims are meritless.  However, we reverse and remand this matter to the circuit court for a new penalty phase pursuant to Hurst v. State.

It is so ordered.

LABARGA, C.J., and PARIENTE, LEWIS, and QUINCE, JJ., concur.
POLSTON, J., concurs as to the conviction and dissents as to the sentence.
PERRY, Senior Justice, concurs in result as to the conviction and concurs in part and dissents in part as to the sentence.
CANADY, J., concurs in result as to the conviction and dissents as to the sentence.

NOT FINAL UNTIL TIME EXPIRES TO FILE REHEARING MOTION, AND IF FILED, DETERMINED.

An Appeal from the Circuit Court in and for Miami-Dade County,
        Dava J. Tunis, Judge - Case No. 131998CF016016000XX

Scott William Sakin of Scott W. Sakin, P.A., Miami, Florida,

        for Appellant/Cross-Appellee

Pamela Jo Bondi, Attorney General, Tallahassee, Florida, and Melissa Jean Roca, Assistant Attorney General, Miami, Florida,

for Appellee/Cross-Appellant